UNITED STATES of America,
Plaintiff-Appellee,

v.

Leon Durwood HARVEY,
Defendant-Appellant,

v.

NATIONAL ASSOCIATION OF CRIMI-
NAL DEFENSE LAWYERS (NACDL);
National Legal Aid and Defender Asso-
ciation (NLADA); and American Bar
Association (ABA), Amicus Curiae.

UNITED STATES of America,
Plaintiff-Appellant,

v.

CAPLIN & DRYSDALE, CHARTERED,
Claimant-Appellee,

and

Christopher F. Reckmeyer, II; Robert
Bruce Reckmeyer, Defendants.

UNITED STATES of America,
Plaintiff-Appellant,

v.

Ronald Burnell BASSETT a/k/a Ronnie
Bump, a/k/a The Kid, a/k/a Zachary
Jackson, a/k/a Ronald Jackson, a/k/a
Beamon Jackson, a/k/a Ronald Jones,
a/k/a R.F. Jones, a/k/a Beamon West,
a/k/a Harry VanDyke, a/k/a The Bird;
Clarence Meredith a/k/a Yo, a/k/a
Magic, a/k/a Houdini, a/k/a Uncle
Willie, Defendants-Appellees.

Nos. 86–5025, 86–5050 and 86–5069.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 4, 1986.

Decided March 6, 1987.

Samuel Rosenthal, Chief, Appellate Section, Criminal Div., U.S. Dept. of Justice (Stephen S. Trott, Asst. Atty. Gen., Criminal Div., Dept. of Justice, Washington, D.C., Henry E. Hudson, III, U.S. Atty., E.D. Va., Alexandria, Va., Breckinridge L. Willcox, U.S. Atty., Dist. of Md., Baltimore, Md., on brief), for the U.S.

Peter Van N. Lockwood (Graeme W. Bush, Steven D. Arkin, Julia L. Porter, Caplin & Drysdale, Chartered, Washington, D.C., on brief), for claimant-appellee Caplin & Drysdale, Chartered.

John L. Pollok (Charles L. Weintraub, Mark A. Summers, Hoffman Pollok & Gasthalter, New York City, on brief), for defendants-appellees Bassett and Meredith.

John Kenneth Zwerling (John Flowers Mark, Michael S. Lieberman, Zwerling, Mark, Ginsberg & Lieberman, Alexandria, Va., P.C., on brief), for defendant-appellant Leon D. Harvey.

(Eugene C. Thomas, President, American Bar Ass'n, Charles G. Cole, Steven H. Goldblatt, Terrance G. Reed, Washington, D.C., on brief), for amicus curiae The American Bar Ass'n.

(Peter Cohen, Washington, D.C., on brief), for amicus curiae Nat. Legal Aid and Defender Ass'n.

Before PHILLIPS, ERVIN and CHAPMAN, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

These three cases, consolidated for purposes of appeal, present important issues respecting the forfeiture provisions of the Comprehensive Forfeiture Act of 1984, ch. 3, Pub.L. No. 98–473, §§ 301 et seq., 98 Stat.1976 (1984) (the Act) (codified at 18 U.S.C. § 1963 (RICO) and 21 U.S.C. §§ 848, 853 (CCE)).

In two of the cases, Nos. 86–5069 and 86–5050, the government appeals district court orders exempting legitimately contracted attorney fees from forfeiture; in the third case, No. 86–5025, the defendant appeals his conviction on the basis that pre-trial restraining orders which forced indigency upon him violated his sixth amendment right to counsel and his fifth amendment right to procedural due process.

Together, the appeals require us to consider (1) whether Congress intended by the Act to authorize pre-conviction restraints on transfer and ultimate forfeiture of property legitimately contracted by defendants to be paid as attorney fees, on the basis alone that the attorney had reasonable cause to believe that the property was subject to forfeiture upon defendant's conviction; (2) if so, whether such an application of the Act would violate either or both the constitutional right to counsel secured to defendants by the sixth amendment, and the associated right to a fundamentally fair trial secured by the fifth amendment; and (3) whether, in any event, post-indictment ex parte restraints on transfers of property, as permitted by the Act solely on the basis of allegations in the indictment, without any opportunity for immediate post-re-

straint hearing, violate fifth amendment rights to procedural due process.

We hold that the Act was intended by Congress to permit such pre-conviction restraints on transfer and ultimate forfeiture of property legitimately contracted to be paid as attorney fees, but that such an application violates the qualified right to counsel of choice secured by the sixth amendment. We further hold that post-indictment *ex parte* restraints on property transfers, as permitted by the Act, violate fifth amendment procedural due process rights where no opportunity for an early post-restraint hearing is afforded but that here the error of entering such an order was harmless and, in any event, no basis for reversing the conviction.

On this basis, we affirm the orders exempting legitimate attorney fees from forfeiture in Nos. 86–5069 and 86–5050 and the criminal conviction in No. 86–5025.

I

The Act significantly revised existing forfeiture provisions in the RICO and CCE statutes by expanding the reach of forfeiture in relation to offense, the types of property subject to forfeiture, and the time frame within which ownership of property subjects it to forfeiture; by liberalizing the provisions for restraining orders or injunctions against transfers of potentially forfeitable property; and by providing a procedure by which third parties can assert, after a defendant's conviction, their interest in property subject to forfeiture. We summarize and briefly analyze those provisions most salient to these appeals.[1]

New 18 U.S.C. § 1963(a)(3) adds[2] to the basic reach of the forfeiture provisions "(3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962." This expanded the reach of the forfeiture provisions from property "associated with" the criminal enterprise to include as well "property derived from the profits" of the criminal enterprise.

New subsection (b) makes clear that all types of property within the defined reach of the Act is subject to forfeiture:

(b) Property subject to criminal forfeiture under this section includes—

(1) real property, including things growing on, affixed to, and found in land; and

(2) tangible and intangible personal property, including rights, privileges, interests, claims, and securities.

Even more critical than these expansions of forfeiture's reach and of the types of property subject to forfeiture, and most critical to the issues before us, is a new provision that the government's interest in property subject to forfeiture arises at the time the charged offense is committed rather than, as formerly, at the time of the defendant's conviction. Subsection (c) now provides that:

(C) All right, title, and interest in property described in subsection (a) vests in the United States upon the commission of the act giving rise to forfeiture under this section. Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes in a hearing pursuant to subsection (m) that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the

---

1. For convenience, the specific references and citations we use are to the RICO forfeiture provisions, but because these are virtually identical to the CCE provisions the references serve for both.

2. Subsection (a) previously reached only, and still reaches:
   (1) any interest the person has acquired or maintained in violation of section 1962; [and]
   (2) any—

(A) interest in;
(B) security of;
(C) claim against; or
(D) property or contractual right of any kind affording a source or influence over;
any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962.

property was subject to forfeiture under this section.

This "relation-back" provision was designed to close a loophole in the existing statutes that had permitted defendants to escape *in personam* forfeiture by transferring assets to third parties before conviction. S.Rep. No. 225, 98th Cong., 1st Sess. 200–01, *reprinted in* 1984 U.S.Code Cong. & Ad.News, 3182, 3383–84 [hereinafter cited as Senate Report].

The rights of third parties who claim an interest in property sought to be forfeited are now provided in new subsections (j) and (m). Subsection (j) prohibits third parties from intervening in the trial or appeal of a criminal case involving forfeiture and from commencing an action challenging the government's alleged interest in property that has been alleged to be subject to forfeiture in an indictment on information. Subsection (m) then relegates third parties to asserting their interests in post-conviction proceedings:

> (m) ... (2) Any person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may ... petition the court for a hearing to adjudicate the validity of his alleged interest in the property. The hearing shall be held before the court alone, without a jury.

Subsection (m)(6) specifies the showing a third party is required to make to have her property relieved of the forfeiture. The court will exempt the property from forfeiture only if the third party is able to show that:

> (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or
>
> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest

in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section.

The 1984 amendments also broaden, in ways critical to the issues before us, the Government's power to obtain preconviction orders restraining the defendant's use of property alleged to be subject to forfeiture. Subsection (e)(1) authorizes the Government to seek and the courts to enter injunctions and restraining orders either before or after the defendant is indicted. Such orders may issue before indictment only after notice and hearing unless the government demonstrates *ex parte* that there is a substantial probability that the property will be proven at trial to be subject to forfeiture and that giving notice would jeopardize the availability of the property for forfeiture. In that case, an *ex parte* order may be issued but it must expire within 10 days, and a hearing concerning such an order, if requested, must be held as early as possible. After indictment, however, restraining orders may be issued on the basis alone of the indictment's allegation that the property described would be subject to forfeiture upon conviction; no special judicial hearing either before or after entry of the order is required.

Together, these new RICO and CCE forfeiture provisions obviously enhance greatly the power of the government to restrain a defendant's use of his property before conviction and expand greatly the scope of assets subject to forfeiture after conviction. Each of the cases consolidated on this appeal concerns the proper interpretation and application of one or more of these new forfeiture provisions.

In each case the Government has invoked the new provisions in ways that prevent the defendants from paying (or their attorneys from receiving or retaining) agreed fees. Although the cases then raise common questions of law, each arises in a different factual setting and reaches this court in a different procedural posture that requires separate statement.

## II

### A.

*United States v. Bassett and Meredith (Bassett)*

Appellees Bassett and Meredith were indicted in the District of Maryland on December 20, 1985, for various offenses, including conducting a continuing criminal enterprise. The indictment included an allegation that Bassett and Meredith should forfeit to the United States any profits derived from their alleged enterprise. Five weeks after the return of the indictment, without seeking a restraining order, the Government notified counsel for appellees that it would seek forfeiture of fees paid them by appellees should appellees be convicted. Appellees' counsel responded by moving for an exemption of their fees from the forfeiture count, asserting that their continued representation of appellees was conditioned on receiving payment of their fees.

The district court granted counsel's motion on April 11, 1986. Although it found that the literal language of the Act appeared to permit the forfeiture of attorneys fees, the court concluded from its review of the legislative history that Congress had intended to require the forfeiture of property held by third parties only when the transfer of assets was the result of a "sham" or "fraudulent" transaction. The court stated that although the appellees' attorneys could not be accounted as "innocent as bona fide purchasers for value," they also were not merely "bogus conduits" of the defendants' ill-gotten goods. Because the attorneys received their fees as the result of an arms' length transaction, the court held that the Government could not seek the forfeiture of such fees under the Act as properly interpreted.

The district court considered that its statutory interpretation was bolstered by the sixth amendment violations threatened by a contrary interpretation. The court noted defendants have a qualified sixth amendment right to counsel of their choice so long as they had the resources to retain such counsel. The threat of forfeiture of attorneys fees upon conviction might deprive defendants of this right by making it far less likely that an attorney would accept their case. Further, the already overtaxed resources of the public defender's office probably could not adequately handle the exceedingly complex cases it would then receive. The court also noted that in cases in which the Government threatened forfeiture the defendant might be both unable to obtain private counsel and ineligible for a court-appointed attorney. The court found it appropriate therefore to avoid these potential sixth amendment problems by interpreting the statute as not permitting the forfeiture of legal fees contracted for in a bona fide transaction.

The Government seeks a reversal of the district court's order on grounds that the court's interpretation of the statute is legally erroneous. The Government contends that the literal language of the statute permits the forfeiture of attorneys fees and that the legislative history does not support a contrary interpretation.

### B

*United States v. Caplin & Drysdale (Reckmeyer)*

The firm of Caplin & Drysdale began its representation of defendant Christopher F. Reckmeyer in the summer of 1983, over 18 months before a grand jury investigation led to his indictment in the Eastern District of Virginia on various offenses, including a charge of operating a continuing criminal enterprise. The January 15, 1985, indictment included a forfeiture count that sought forfeiture of virtually all Reckmeyer's assets. On January 14, 1985, the day before the indictment was returned, the Government obtained an *ex parte* restraining order barring the transfer of assets covered by the indictment.

Throughout its representation to that point, Caplin & Drysdale had received regular payments from Reckmeyer, including a payment of $25,480 on January 25, 1985, the day Reckmeyer surrendered to authorities. The firm notified the court of its receipt of these funds, which were thereup-

on deposited in a separate escrow account. At Reckmeyer's request, the firm continued its representation of him after the indictment.

On March 14, 1985, Reckmeyer pled guilty to three counts of the indictment. The following day the court denied counsel's motion to exempt its fees from the restraining order on the ground that Reckmeyer had pled guilty to conducting a continuing criminal enterprise. Upon Reckmeyer's conviction on May 17, 1985, the court entered a forfeiture order that included virtually all of Reckmeyer's assets and the $25,480 held in escrow by Caplin & Drysdale. On June 17, 1985, Caplin & Drysdale filed a third-party claim pursuant to § 413(n) of the CCE Act asserting an interest in the amount of $170,000, representing unpaid legal fees. In it they asserted that because forfeiture of their fees would violate Reckmeyer's sixth amendment right, those fees must be exempted.

The court granted Caplin & Drysdale's motion to exempt its fees from forfeiture on March 27, 1986, 631 F.Supp. 1191. Unlike the court in *Bassett*, which found that the Government could not reach assets held by *any* third parties unless the transfer was a sham or otherwise fraudulent, the district court here found only that Congress did not intend for *bona fide* attorneys fees to be subject to forfeiture under the CCE. The court agreed, however, with the *Bassett* court's conclusion that an interpretation of the statute that permitted the forfeiture of attorneys fees would violate the defendant's sixth amendment rights to counsel of choice and to the effective assistance of that counsel.

In this appeal the Government contends, as in *Bassett*, that forfeiture of legitimate attorneys fees was intended under the Act and does not in general violate the sixth amendment.

### C.

*United States v. Harvey (Harvey )*

Appellant Harvey was indicted in the Eastern District of Virginia on October 16, 1985, for over 20 different offenses including various RICO offenses and operating a continuing criminal enterprise. The indictment included an allegation that all of Harvey's assets should be forfeited to the United States. On the same day, the Government obtained in an *ex parte* hearing a restraining order that barred Harvey from making any use of any of his property, including currency and accounts, until the conclusion of his trial and all appeals. This restraining order was then served on Harvey's attorney, John Mark of Zwerling, Mark, Ginsberg and Lieberman, P.C., who had already begun work on Harvey's case.

The court denied Mark's request that his firm be permitted to make an appearance in the case conditioned on the exemption of their fees from the restraining order. In a subsequent hearing the court also denied the firm's motion to exempt its fees from the restraining order. The court, however, acknowledged that the restraining order rendered Harvey indigent and appointed Mark's law partner, John Zwerling, to represent Harvey. A request that all four members of the firm be appointed was denied, but the court did agree to appoint two members of the firm, so long as one of them was Zwerling. The court permitted Zwerling to decide whether Mark or Lieberman would assist him.

After denial of its motion to withdraw because it lacked the resources necessary to prepare an adequate defense, counsel filed numerous motions to be allowed to retain various experts with Criminal Justice Act funds and a motion to be allowed to utilize the assistance of another member of their firm. These motions were largely denied, although the court did permit counsel to retain an accountant and a psychiatric expert. Nevertheless, as counsel have summarized the situation in their brief, "[t]he preparation for trial bore no resemblance to the preparation that normally would and should, but could not, be undertaken prior to a trial of this magnitude."

After a three-day bench trial, Harvey was convicted of most of the charges on which he had been indicted, including the RICO and continuing criminal enterprise offenses. The district court then ordered

forfeiture of all property described in the RICO and CCE counts. Harvey now seeks a reversal of his conviction on grounds that his sixth and fifth amendment rights were violated. Harvey contends that by refusing to exempt attorneys fees from forfeiture the court violated his sixth amendment right to counsel of his choice. He also asserts that the *ex parte* restraining order prohibiting use of his assets to retain counsel of his choice violated his fifth amendment procedural due process rights.

### III

■ The threshold question presented by each of these appeals is whether Congress intended the Act to make legitimately contracted for or paid attorneys' fees subject to forfeiture and pre-conviction restraint. If Congress did not so intend, the principal substantive issue in each appeal must be resolved against the government and there will be no need for this court to address the fifth and sixth amendment issues.

As indicated, the district courts in both *Bassett* and *Reckmeyer*, relying principally upon legislative history, interpreted the forfeiture provisions of the Act as not being intended to reach property contracted for or paid as attorney fees unless the transaction was a sham or fraudulent one intended to defeat the government's entitlement to forfeiture. Because there was no suggestion of sham or fraud in either case, the courts in both granted requested exemptions from forfeiture.

Though the *Bassett* and *Reckmeyer* courts' statutory interpretation finds support in a majority of the federal decisions to date on the point[3] we disagree with that interpretation and reject it. We think instead that the language of the relevant forfeiture provisions is so clear and so

plainly reaches property legitimately contracted to be paid or paid as attorneys fees as not to permit judicial resort to legislative history to resolve ambiguity on the point or to avoid a manifestly unintended application. Further, we think that even if resort to legislative history were made, examination of that history would reveal no such clear intent to exclude property marked for or paid as attorney fees as would be required to compel such an interpretation, and indeed would tend rather to confirm the contrary intention reflected in the plain statutory language. Finally, we believe that the plain language of the forfeiture provisions does not permit a judicial interpretation that avoids the serious constitutional questions generally conceded by all to exist.

■ Statutory construction properly begins with examination of the literal language of a statute, *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981), and it properly ends there unless the language is ambiguous, *id.*, or would, as literally read, contravene a clearly expressed legislative intention, *Russello v. United States*, 464 U.S. 16, 20, 104 S.Ct. 296, 299, 78 L.Ed.2d 17 (1983). Here, we are satisfied that the literal language of the statute is not ambiguous, that an interpretation of that language according to its plain meaning contravenes no clearly expressed legislative intent, and that such an interpretation is therefore the proper one. A simple parsing of the critical forfeiture provisions shows why.

Those forfeiture provisions have two elements. The first defines, in two ways, property interests subject to forfeiture: by relation of property to offenses charged, § 1963(a) and by kind, § 1963(b). Attorney fees are neither expressly excluded nor included; they are not mentioned. The sec-

---

**3.** *United States v. Estevez*, 645 F.Supp. 869 (E.D. Wis.1986); *United States v. Figueroa*, 645 F.Supp. 453 (W.D.Pa.1986); *United States v. Ianniello*, 644 F.Supp. 452 (S.D.N.Y.1985); *United States v. Badalamenti*, 614 F.Supp. 194 (S.D.N.Y. 1985) (expressly disagreeing with *Payden*, cited *infra*, from same district); *United States v. Rogers*, 602 F.Supp. 1332 (D.Colo.1985). *Contra United States v. Harvey*, No. CR–85–224–A (E.D. Va. Nov. 8, 1985) (on this appeal); *In re Grand*

*Jury Subpoena Duces Tecum dated January 2, 1985 (Payden )*, 605 F.Supp. 839 (S.D.N.Y.1985) (expressly disagreeing with *Rogers* analysis); *see also* Brickey, *Forfeiture of Attorneys' Fees: The Impact of RICO and CCE Forfeitures on the Right to Counsel*, 72 Va.L.Rev. 493 (1986) (arguing that forfeiture of legitimate attorneys' fees was intended by Congress) [hereafter cited as Brickey, *Forfeiture* ].

ond element then describes the only two conditions upon which property generally subject to forfeiture under §§ (a) and (b) may be exempted by third party claims of superior title: proof of title superior to that of defendant at the effective date of forfeiture, § 1963(m)(6)(A); and proof of title superior to that of the government by subsequent transfer to the claimant as a "bona fide purchaser," § 1963(m)(6)(B). Again, attorney fees are not expressly singled out for special treatment; they are not mentioned.

Simply put, the literal language of these critical forfeiture provisions unambiguously includes within the property interests that are made subject to forfeiture under §§ 1963(a) and (b) property contracted to be paid or paid as attorneys fees, and then just as unambiguously subjects such property, if subject to forfeiture, to the same conditions for exemption provided for all forfeitable property by §§ 1963(m)(6)(A) and (m)(6)(B). Property marked for or paid as attorney fees is necessarily included within that defined as subject to forfeiture by §§ 1963(a) and (b) for the simple reason that those provisions define forfeitable property without regard to its intended or actual use, whether for payment to attorneys or for other uses. Similarly, the conditions for exemption by virtue of superior title are defined in §§ 1963(m)(6)(A) and (B) without reference to the professional or other status of title claimants. Under the literal language of the forfeiture provisions, therefore, property contracted to be paid or paid as attorney fees may first be included as forfeitable property and may then not be subject to exemption, depending solely upon the particular facts that determine inclusion and exemption of property in general.

While recognizing that these critical statutory provisions seemed literally to contemplate the forfeitability in some cases of property legitimately marked for or paid as attorney fees, the district courts in *Bassett* and *Reckmeyer* nevertheless rejected that interpretation. *United States v. Bassett*

*and Meredith,* 632 F.Supp. 1308, 1311 (D.Md.1986); *United States v. Reckmeyer,* 631 F.Supp. 1191, 1195 (E.D.Va.1986); *see also United States v. Badalamenti,* 614 F.Supp. 194, 196 (S.D.N.Y.1985). Instead, they held forfeiture was intended by Congress only when the attorney fee transaction could be shown to be a sham or fraud designed to defeat the government's forfeiture rights. To reach this conclusion these courts resorted to legislative history and found there a congressional intention to exempt such property.

As indicated, this conclusion has also been reached by a majority of the other district courts that have addressed the issue. It cannot, therefore, lightly be discounted. Indeed the near unanimity to date of district courts in rejecting a literal interpretation of this important federal statute is rather remarkable in itself. Certainly it bespeaks a substantial and widespread concern by these base-line federal courts with the practical and policy implications of a literal interpretation. In effect, these courts seem to be saying that they simply cannot believe that Congress could have intended, despite the statute's literal import, that these forfeiture provisions reach legitimately contracted attorney fees, given the impact of such an interpretation upon the ability of defendants in criminal cases to arrange privately for their defenses.

Without discounting the practical and policy concerns expressed by these courts, we nevertheless cannot agree with their conclusion. We believe instead that legislative history confirms that Congress indeed intended, as the Act literally provides, that property legitimately contracted for or paid as attorney fees might be forfeitable in particular cases.

■ The courts that have found a contrary legislative intent have found that intent principally in passages of legislative history related to the "bona fide purchaser"[4] exemption provisions of §§ 1963(c)

---

**4.** Defendants seek without great zeal to make something of the ambiguity of the term "purchaser" as applied to "sellers" of services such as

attorneys. In this, however, they meet themselves coming back, for attorneys must qualify as "purchasers" in order to invoke the exemp-

and (m)(6)(B). These courts have emphasized that, for extrinsic reasons, these provisions actually disfavor attorneys in relation to all other transferees. By virtue of their special knowledge and relationships with defendants, attorneys are more likely than any other type of transferee to be unable to satisfy the condition that they be "reasonably without cause to believe that the property was subject to forfeiture." This special disadvantage created *sub silentio* by the statutes' failure to single attorneys out for preferential treatment as transferees has been the principal point then seized upon by courts in rejecting a literal reading of the statutes. The perceived anomaly of making attorney fees specially vulnerable to rather than specially protected from forfeiture by this means has seemed to these courts so great and so threatening to constitutionally secured rights to counsel as to justify the search for a contrary or limiting intent in legislative history.

The principal passages relied upon and the basis upon which courts, including the district courts in *Bassett* and *Reckmeyer*, have found in them a legislative intent at odds with a literal reading of the statutes can be briefly summarized. A portion of a Senate Report, referring to the provision in § 1963(m)(6)(B) for proof by third persons of "bona fide purchaser" status, explained in a footnote that

> The provision should be construed to deny relief to third parties acting as nominees of the defendant or who have knowingly engaged in sham or fraudulent transactions. The standard for relief reflects the principles concerning voiding of transfers set out in [§ 1963(c)]....

Senate Report at 209 n. 47, 1984 U.S.Code Cong. & Ad. News at 3392 n. 47.

Another portion of that Report referring to the relation-back provision of § 1963(c)

and its effect upon subsequent transfers, explained that

> The purpose of this provision is to permit the voiding of certain pre-conviction transfers and so close a potential loophole in current law whereby the criminal forfeiture sanction could be avoided by transfers that were not "arms' length" transactions.

Senate Report at 200–01, 1984 U.S.Code Cong. & Ad.News at 3383–84.

Finally, the House Judiciary Committee, in the course of describing the intended purpose and workings of pre-trial restraining orders under related forfeiture provisions in the Comprehensive Drug Penalty Act of 1984, stated that "[n]othing in this section is intended to interfere with a person's Sixth Amendment Right to counsel." H.R.Rep. No. 845, part 1, 98th Cong., 2d Sess. 19 n. 1 (1984) (House Report).

From these passages the district courts in *Bassett* and *Reckmeyer*, following other district courts, found a legislative intent to confine the forfeitability of attorney fees to situations where the fee transaction was "a sham or fraudulent" one designed to avoid forfeiture by using the attorney as a mere conduit for shielding the property. *See Bassett*, 632 F.Supp. at 1315–16; *Reckmeyer*, 631 F.Supp. at 1195. Under this construction Congress intended that attorney fees should not be subject to pre-trial restraining orders or to ultimate forfeiture so long as the fee transaction was conducted "at arms length and not as ... part of an artifice or sham to avoid forfeiture." *United States v. Rogers*, 602 F.Supp. 1332, 1348 (D.Colo.1985). In coming to this conclusion, the courts have expressly relied upon a belief that such a limiting interpretation was compelled as to attorney fees to avoid serious constitutional questions respecting the right to counsel. *Bassett*, 632 F.Supp. at 1316–17; *Reckmeyer*, 631 F.Supp. at 1194–98.

tion provisions of the Act. In any event, legislative history makes it plain, if resort to it were required, that "purchasers" in this context was intended to apply to providers of services as well as to other transferees for value. *See* Senate Report at 200 n. 28, 1984 U.S. Code Cong. &

Ad. News at 3383 (citing with approval *United States v. Long*, 654 F.2d 911 (3d Cir.1981), which upheld forfeiture of property transferred as attorney fees under pre-indictment Act, as illustrative of intended operation of relation-back provision of amended Act).

The upshot of such an interpretation is flatly to read out of the "bona fide purchaser" provision the literal requirement that attorneys, like all claimants, be without reasonable cause to believe that their fees might be payable out of property subject to forfeiture, and to substitute the much more modest requirement that the fees shall have been legitimately contracted for legal defense services, without regard to the attorney's knowledge of the possible taint of the fees' source. As indicated, we do not believe that such a drastically narrowing interpretation can be justified, either on the basis of resolving facial ambiguity in the statutes, or of rejecting a literal interpretation that contravenes a clearly expressed legislative intent, or of avoiding serious constitutional questions.

The statutory provisions are simply not facially ambiguous, as our parsing of the critical language has demonstrated. Courts that have found an opening wedge of ambiguity have found it not in what the provisions *say*, but in what they do *not* say, *see Reckmeyer*, 631 F.Supp. at 1195 (no express mention of counsel fees); *Bassett*, 632 F.Supp. at 1131 (no express indication of how "without cause to believe" requirement applies to special case of defense counsel), or in the perceived anomaly of applying what the provisions literally say to permit forfeiture of attorney fees, *see Badalamenti*, 614 F.Supp. at 196 ("would raise ... constitutional and ethical problems").

■ But this will not do. It is an elementary and profoundly important canon of statutory construction that ambiguity cannot be bootstrapped in these ways. "The proper function of legislative history is to solve, and not create an ambiguity." *United States v. Rone*, 598 F.2d 564, 569 (9th Cir.1979) (citing *United States v. Blasius*, 397 F.2d 203, 206 (2d Cir.1968)); *see also Ex Parte Collett*, 337 U.S. 55, 61, 69 S.Ct. 944, 947–48, 93 L.Ed. 1207 (1949) ("plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction ..., may furnish dubious bases for inference in every direction").

■ Nor do the passages of legislative history relied upon by those courts reveal a clearly expressed legislative intention that would be contravened by applying the provisions according to their literal language. Rejection of the literal interpretation is therefore not justified under the venerable principle applied in such cases as *Russello*, 464 U.S. at 20, 104 S.Ct. at 299; that mandates deference to a clearly expressed legislative intention when that intention would be undercut by a specific application of a statute's literal import.

Though both of the first two quoted excerpts from legislative history do emphasize that a central concern behind the relation-back provisions was to void sham and fraudulent transfers, they cannot fairly be read to identify this as the exclusive concern. A legislative intent more restrictive than that reflected in the literal sweep of a statute cannot be inferred from the fact alone that the statute as plainly written sweeps more broadly than the central concern that prompted its enactment. *See, e.g., Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 110–11, 100 S.Ct. 2051, 2057–58, 64 L.Ed.2d 766 (1980) (that statute literally affects broader range of conduct than the conduct of principal concern to Congress does not justify interpretation restricting application to conduct of principal concern); *United States v. Lee*, 726 F.2d 128, 131 (4th Cir. 1984) (plain meaning of statute cannot be avoided "merely by showing that Congress ... was largely concerned with a [different type of specific conduct]").

That Congress' concern ran more broadly than just to sham and fraudulent transfers is in fact the much more plausible reading of the whole of the relevant legislative history. For example, the first portion of legislative history quoted above was a footnote to a passage of text in the Senate Report that reflected the wider concern by simply citing the text of the "bona fide purchaser" provision as defining one of the two bases upon which a third party claim of superior title might prevail. In this context, the footnote is best read as simply emphasizing that sham and fraudulent

transfers would obviously fall within the category of voidable transfers.[5]

Even more telling is another passage of the Senate Report explaining the need for adding the relation-back provision to then current RICO forfeiture provisions.

The problem of pre-conviction dispositions of property subject to criminal forfeiture is further complicated by the question of whether, *simply by transferring an asset to a third party,* a defendant may shield it from forfeiture. In civil forfeitures, such transfers are voidable, for the property is considered "tainted" from the time of its prohibited use or acquisition. But it is unclear whether, in the context of criminal forfeitures, the same principle is applicable so that improper pre-conviction transfers may be voided.

In sum, present criminal forfeiture statutes do not adequately address the serious problem of a defendant's pretrial disposition of his assets. Changes are necessary both to preserve the availability of a defendant's assets for criminal forfeiture, and, in those cases in which he does transfer, deplete, or conceal his property, to assure that he cannot as a result avoid the economic impact of forfeiture.

Senate Report at 196; 1984 U.S.Code Cong. & Ad.News at 3379 (emphasis added).

This passage reflects a clear congressional intent to make voidable a wider range of asset transfers than just sham or fraudulent ones. Certainly the thought reflected is not contravened by the literal language of §§ 1963(c) and (m)(6)(B) which makes voidable all transfers except those to persons who qualify as "bona fide purchasers" in the classic sense of being "without notice," a state of knowledge or belief obviously short of being "without fraud."

We are therefore persuaded that the legislative history reflects no clearly expressed intention that attorney fees should only be forfeitable when based on "sham or fraudulent" transactions or when not negotiated "at arms length." The plain language of the statute cannot therefore properly be rejected on the basis that it contravenes any contrary legislative intent to be found in legislative history. And to the extent that the district courts in *Bassett* and *Reckmeyer* thought that the statutes' plain language must be rejected to avoid an anomalous result in regard to attorney fees, "[t]he short answer is that Congress did not write the statute that way." *North Carolina Department of Transportation v. Crest Street Community Council,* ── U.S. ──, 107 S.Ct. 336, 341, 93 L.Ed.2d 188 (1986) (quoting *Garcia v. United States,* 469 U.S. 70, 79, 105 S.Ct. 479, 485, 83 L.Ed.2d 472 (1984) (quoting *Russello,* 464 U.S. at 23, 104 S.Ct. at 300 (quoting *United States v. Naftalin,* 441 U.S. 768, 773, 99 S.Ct. 2077, 2082, 60 L.Ed.2d 624 (1979)))).

■ Finally, that the forfeiture provisions raise serious constitutional questions does not justify a saving interpretation in these cases. The familiar and important principle is that when a statute is fairly susceptible to more than one interpretation, the interpretation most consistent with constitutionality should be adopted. *See, e.g., United States v. Rumely,* 345 U.S. 41, 45, 73 S.Ct. 543, 545–46, 97 L.Ed. 770 (1953). But this of course contemplates that the statute be sufficiently ambiguous to permit a judicial choice between more than one permissible reading. *Id.* at 45, 73 S.Ct. at 545 (choice between "fair alternatives" must favor that which avoids serious constitutional questions); *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932) ("cardinal principle that ... Court will first ascertain whether a construction ... is fairly possible ... by which the [constitutional] question may be avoided"); *see also* 2A Sutherland, *Statutory Construction* § 45.05 at 15–16 (courts not free to interpret in violation of congression-

5. Perhaps significantly, the influential opinion in *Rogers,* 602 F.Supp. at 1332, was able to find in this passage an exclusive concern with sham and fraudulent transactions by expressly implying in it a critical thought not literally expressed. *Id.* at 1347 (quoting: "The provision should be construed to deny relief [only] to third parties acting as nominees or who have knowingly engaged in sham or fraudulent transactions.") (bracketed insertion by the court).

al intent even if only so may constitutionali- ty be preserved).

Here, as our discussion of the plain meaning of the critical provision has shown, the statutory language simply presents no opportunity for choice between "fair alternatives." The House Judiciary Committee Report referring to possible constitutional questions in respect of relat- ed forfeiture provisions does not aid de- fendants on this point. The cryptic state- ment that "nothing in this section [provid- ing for pre-trial restraining orders] is in- tended to interfere with a person's Sixth Amendment Right to counsel" obviously does not alter what the forfeiture provi- sions say. To the extent it is at all relevant to consider the significance of this state- ment, its probable meaning and purpose are too unclear to aid statutory interpreta- tion. It may reflect no more than a re- assuring political gesture to members of Congress concerned about possible consti- tutional problems. It may merely disclaim any intention to enact legislation thought to be unconstitutional, or it may merely express a belief that the provisions as writ- ten do not violate constitutional rights or that specific applications will of course be subject to constitutional challenge in the courts. On no possible reading could this comment be taken as. a clearly expressed congressional intention that attorneys fees should only be forfeitable when based upon sham or fraudulent transactions.

For these reasons [6] we disagree with the statutory interpretation of the district courts in *Bassett* and *Reckmeyer* and af- firm that of the district court in *Harvey*. With the latter court, we hold that the critical provisions must be interpreted ac- cording to their literal import and that this contemplates the forfeiture of attorney fees in any circumstances where the attor- ney cannot establish that he was "without reasonable cause to believe that the proper- ty [used to pay the fees] was subject to forfeiture."

## IV

Having decided that the Act contem- plates no special exemption of attorneys' fees from forfeiture, we turn to the issues whether and to what extent the constitu- tion nevertheless compels such an exemp- tion, and whether the Act provides consti- tutionally sufficient procedural protections in connection with the forfeitures and re- straints on property transfers that it al- lows. A preliminary analysis of the par- ties' constitutional contentions may help to narrow the scope of these difficult issues and to put them in proper perspective for discussion.

First off, the defendants' constitutional challenge is a multi-faceted one which in- volves both substantive and procedural rights. In essence, though they do not put it just this way, defendants claim that when the government proceeds under the Act—whether by order or threat—to de- prive defendants of the right to transfer property to pay legitimate attorneys' fees, two distinct though contextually inter- twined substantive rights are implicated: the right to hold and use property free of governmental deprivation without the due process guaranteed by the fifth amend- ment, and the right to counsel guaranteed (primarily) by the sixth amendment. And they assert that because substantive prop- erty rights are implicated, so necessarily are procedural due process rights in con- nection with deprivations of that property.

The government does not—could not— contest that substantive property rights and concomitant procedural due process rights are necessarily implicated by the for- feiture and restraint provisions of the Act. This is a self-evident proposition without regard to the intended use of the proper- ty—whether to pay attorneys fees or other- wise. Indeed, the Act reflects awareness of the need to provide procedural due pro- cess in connection with property depriva-

---

**6.** Because we consider these reasons sufficient, we need not address the disputed question whether this court's pre-amendment decision in *United States v. Raimondo,* 721 F.2d 476 (4th Cir.1983), has already decided, with binding ef-

fect upon this panel, that Congress intended by the Act to subject attorney fees to forfeiture on the same basis generally controlling third party transfers.

tion, whatever the property's use and whether the deprivation is by pre-conviction restraining orders or post-conviction orders of forfeiture. As to the procedural right, however, the government of course takes the position that the Act's procedural protections supply the process due. Defendants on their part do not challenge the adequacy of the procedural protections except to the extent that the defendant in *Harvey* seeks to challenge the procedures provided in respect of post-indictment restraining orders.

In sum, no one questions that fifth amendment procedural due process rights are implicated by restraining orders and forfeiture orders affecting a defendant's property contracted or paid as attorneys fees. The only dispute touching those rights is that in *Harvey* as to the adequacy of the procedures provided in conformity with the Act for the post-indictment restraining order in that case.

The much more difficult issue is whether any sixth (or fifth) amendment substantive right to counsel independent of the unquestioned property right is also implicated by restraining orders and forfeiture orders directed at attorneys' fees. As to this, the government contends that no such right to counsel is implicated, at least not by the Act as written and as applied in these cases. Conceding that specific misapplications of the Act might involve arbitrary or overreaching conduct by the government in violation of the fifth amendment right to a fundamentally fair trial, or outright denials of counsel or the effective assistance of counsel in violation of the sixth amendment, the government contends that no such claim has been made or could be made in any of these cases. In any event, the government asserts, no outright denial of counsel, or ineffective assistance of counsel, or fundamentally unfair trial claim could properly be entertained until after conviction had laid the basis for assessing (or, in respect of an outright denial claim, assuming) actual prejudice. Furthermore, even if it be assumed that in strict conformity with the Act, defendants might be made financially unable to employ private counsel by virtue of restraining orders, this would not involve the outright denial of counsel, given the right to appointed counsel by virtue of indigency that would then arise (as actually occurred in *Harvey* ). Finally, the government contends that restraining and forfeiture orders under the Act implicate no sixth amendment right to counsel of choice. That right, according to the government, is a stringently qualified one that has been recognized only in exceptional circumstances not present here. Its limits in any event are found in sufficiently countervailing governmental interests, which are present here in the necessity to prevent the pre-conviction concealment and dissipation of forfeitable property and concomitantly to cut off the economic base for further criminal activity by defendants.

The defendants contend to the contrary that the Act's forfeiture provisions as literally applied to attorneys' fees do implicate sixth amendment rights to counsel independently of any fifth amendment procedural due process rights respecting property deprivation. Essentially they argue that the mere potential under the Act for restraining orders and forfeiture orders affecting the payment of attorneys' fees (not to say any actual restraints and forfeitures) immediately and necessarily violates sixth amendment rights to counsel of choice and to the effective assistance of counsel by its *in terrorem* effect upon counsel and counsel-client relationships. Furthermore, they say that in some circumstances, the Act as written may operate to deny *any* counsel when, as may well occur, private counsel are all deterred by the prospects of forfeiture but defendant cannot qualify by indigency for appointed counsel.

We will take the right to counsel and procedural due process issues in that order.

### A.

The courts and commentators that have considered the matter, the Justice Department, and the American Bar Association generally seem to have agreed that forfeiture of attorney fees may at some point run afoul of sixth amendment rights to counsel and, possibly, congruent fifth

amendment rights to a fundamentally fair trial. Every court which to date has interpreted the Act as not intended to reach attorneys' fees untainted by sham or fraudulent transactions has done so on the basis, in part, that wider forfeiture would at least raise serious sixth amendment questions which should and can be avoided.[7] The Justice Department, while maintaining that "there are no constitutional ... prohibitions" to the wider forfeiture of attorney fees in accordance with the Act, has nevertheless, in obvious response to court decisions and objections by the organized bar, promulgated formal guidelines designed to temper the conceded impact of forfeiture upon defense counsels' "ability to represent their clients." *Justice Department Guidelines on Forfeiture of Attorneys' Fees, reprinted in* 38 Crim.L.Rep. (BNA) 3001, 3003.[8] The American Bar Associa-

tion, which appears as amicus curiae on this appeal, advises that it has taken formal positions opposing attorney fee forfeitures except in sham or fraud situations, and contends on this appeal that those positions are grounded in sixth amendment considerations. *Brief Amicus Curiae of the American Bar Association* 12–17. While the commentators are divided in their assessments of sixth amendment questions, none seems to have doubted that a genuine question exists.[9]

There is thus general agreement that at some point action by government which effectively prevents a defendant from using otherwise available property to hire a lawyer to defend him against criminal charges could violate his constitutionally secured rights to counsel. But there is basic disagreement and considerable uncer-

---

**7.** *See* cases so holding cited in note 3, *supra.* Actually, several of these courts have seemed to hold alternatively that the Act, if intended to reach legitimate attorney fees, *would* violate sixth amendment rights to counsel. *See, e.g., Bassett,* 632 F.Supp. at 1317 (so to read the Act "is to violate Sixth Amendment principles"); *Reckmeyer,* 631 F.Supp. at 1196 (application of Act "to encompass bona fide attorney's fees would violate a defendant's Sixth Amendment rights"); *Badalamenti,* 614 F.Supp. at 198 (if intended to reach bona fide attorney fees court would "conclude that in this application it ran afoul of the Sixth Amendment").

**8.** The Justice Department guidelines are particularly interesting in their identification of the most questionable aspects of the forfeiture provisions as applied to attorney fees and in their means of ameliorating those aspects, presumably to guard against constitutional challenges to particular applications.

In a preamble, the Department "recognizes that attorneys, who among all third parties uniquely may be aware of the possibility of forfeiture, may not be able to meet the [bona fide purchaser] requirements ... without hampering their ability to represent their clients" and specifically, that holding attorneys to the general "without cause to believe" standard "may prevent the free and open exchange of information between an attorney and a client." *Justice Department Guidelines on Forfeiture of Attorneys' Fees, reprinted in* 38 Crim.L.Rep. (BNA) 3001, 3003.

On this basis, the Department concludes that prosecutorial discretion should be exercised in applying the forfeiture provisions to attorney fees, and adopts as Department policy that no such forfeiture will be sought without prior

approval of the Assistant Attorney General, Criminal Division, pursuant to specific guidelines. In their most relevant portions, these guidelines then provide for seeking forfeiture of fees for representation in criminal matters only when there are reasonable grounds to believe that a fee transaction is a sham or fraudulent one, or reasonable grounds (not acquired from compelled disclosure of confidential communications) that the attorney has *actual* knowledge that a *particular* asset received as fees was then claimed to be subject to forfeiture or that it was obtained by criminal misconduct. Further the guidelines announce a policy against giving notice to attorneys that any assets other than those specifically identified in an indictment or restraining order are subject to forfeiture in an avowed effort to avoid challenges of interference with the qualified right to counsel of choice.

**9.** *See* Brickey, *Forfeiture,* 72 Va.L.Rev. at 529–32 (sixth amendment violations may be litigable after conviction); Fossum, *Criminal Forfeiture and the Attorney-Client Relationship: Are Attorneys' Fees Up for Grabs?,* 39 Sw.L.J. 1067, 1091 (1986) ("potential for constitutional violations accompanying [literal] interpretation is serious" but subject to avoidance by governmental discretion); Note, *Forfeiture of Attorneys' Fees Under RICO and CCE,* 54 Fordham L.Rev. 1171, 1193 (1986) (concluding that application of Act to attorneys' fees "creates conflicts with the defendant's sixth amendment right to counsel," but that "the problem is not fatal to the statutes"); Note, *Forfeiture of Attorneys' Fees: A Trap for the Unwary,* 88 W.Va.L.Rev. 825, 843 (1986) ("defendant's sixth amendment right to effective representation may be violated" by the [bona fide purchaser requirement] ).

tainty among the courts and between defendants and the government in these cases about where that point may be, and specifically whether it lies within the range of government action specifically authorized by the Act.

Identifying, in general terms, "serious constitutional questions" in order to justify a saving statutory interpretation is obviously an easier and less serious judicial process than is identifying specific constitutional vices in statutes not subject to alternative interpretations. Certainly that is the case here. Despite the considerable difference between the two processes, however, a good starting point for deciding whether the Act violates specific constitutional rights is to marshal the "serious questions" about possible violations that courts have identified. The questions so identified all concern the potential impact of certain assumed consequences of the Act's application upon particular constitutionally secured rights.

The assumed consequences concern both the ability of defendants to retain private counsel under the threat of forfeiture, and the relationships between a defendant and any privately retained counsel who might undertake representation despite the threat. The primary consequences, as assumed by other courts, as urged by the defendants and associated amici on this appeal, and as, to some extent, conceded by the government, may be summarized as follows.

Pre-conviction restraining orders and, indeed, the mere threat of ultimate forfeiture without any such orders operate directly and immediately to inhibit a defendant's ability to retain private counsel for his defense. Counsel inevitably will be reluctant or unwilling to accept private employment knowing that they may not be able to collect or retain agreed-upon fees. *See, e.g., Bassett,* 632 F.Supp. at 1316–17; *Reckmeyer,* 631 F.Supp. at 1196–97.

Forced indigency, the ultimate consequence of freeze orders, may entitle the defendant to appointed counsel, but this is no answer. The available force of public defenders and legal aid lawyers is insuffi-

cient to provide this assurance. *See Rogers,* 602 F.Supp. at 1349. In any event, freeze orders and the threat of forfeiture may in some cases result in the inability to retain either private or appointed public counsel. This would occur when no private counsel would accept employment under such conditions but the defendant could not qualify as an indigent because of the availability of some untainted assets. *See Badalamenti,* 614 F.Supp. at 197.

If private counsel is retained despite the threat of fee forfeiture, the resulting relationship between counsel and client will necessarily be compromised by conflicts of interest respecting forfeiture possibilities. To the extent counsel's right to obtain or retain fees is dependent upon his not having "reasonable cause to believe" that the source of his fee is forfeitable under the Act, a conflict of interest respecting the tolerable depth of inquiry by counsel into the defendant's conduct is necessarily created. Further, there may arise conflicts of interest respecting plea bargain possibilities involving dismissal of forfeiture counts that might preserve attorney fee sources. *See Reckmeyer,* 631 F.Supp. at 1197; *Badalamenti,* 614 F.Supp. at 196–97.

The specific constitutional rights possibly violated by these consequences have, understandably, been less certainly identified by the courts and by the defendants and their associated amici on this appeal. The following specific rights have, however, been suggested with varying degrees of precision and emphasis: the minimal or basic sixth amendment right to *some* counsel, as recognized, e.g., in *Johnson v. Zerbst,* 304 U.S. 458, 463, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461 (1938); the further sixth amendment right to the effective assistance of whatever counsel undertakes representation, as recognized, e.g., in *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970); the further sixth amendment right to counsel of choice, as recognized in, e.g., *Powell v. Alabama,* 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932); and the related fifth amendment right to a fundamentally fair trial, specifically to a trial not made unfair

by prosecutorial misconduct that unbalances the opposing forces of advocacy, as recognized in, e.g., *Wardius v. Oregon,* 412 U.S. 470, 474, 93 S.Ct. 2208, 2211–12, 37 L.Ed.2d 82 (1973). Taking these as the only constitutional rights arguably implicated by the Act's impact on attorneys' fees, we consider them in turn.

■ We first consider whether freeze orders or the mere threat of forfeiture might violate the discrete right to the effective assistance of counsel or the related right to a fundamentally fair trial. As to these, we agree with the government that while in particular cases such violations might result from specific applications of the Act, this could be determined only after conviction. Before conviction, the mere possibility that particular applications of the Act might ultimately result in such violations could not then subject the Act to constitutional challenge in respect of these particular rights. *See Communist Party v. Subversive Activities Control Board,* 367 U.S. 1, 71, 81 S.Ct. 1357, 1397, 6 L.Ed.2d 625 (1961) ("Merely potential impairment of constitutional rights under a statute does not of itself create a justiciable controversy in which the nature and extent of those rights may be litigated."); *see also* Brickey, *Forfeiture of Attorneys' Fees: The Impact of RICO and CCE Forfeitures on the Right to Counsel,* 72 Va.L.Rev. 493, 529–32 (1986) (no sixth amendment right litigable before conviction). Accordingly, no challenge to the Act, either facially or as applied, on these particular grounds lies before conviction.

■ We next consider whether the Act facially or by particular applications might violate the "basic" right to counsel guaranteed by the sixth amendment. We start by recognizing that this is only the right to have *some* counsel (actually, not to be denied *any* counsel). This discrete right is therefore satisfied by having either privately retained or governmentally appointed counsel. When indigency prevents the private retention of counsel, a specific right to appointed counsel thereupon arises. *Johnson,* 304 U.S. at 463, 58 S.Ct. at 1022. The worst possible effect of the Act's application upon this minimal right could only be to force indigency upon the defendant by freeze orders. Since this creates a right to appointed counsel, a right not affected in any way by the Act, the Act does not on its face violate the minimal right, nor could it by any application other than one that included a follow-up refusal to appoint any counsel. No such application is involved in any of the cases before us.

This leaves only the possibility that the Act, either facially or by specific applications, might violate a defendant's sixth amendment right to counsel of choice. This, say the defendants, will necessarily occur whenever freeze orders actually force indigency upon a defendant, or, short of that, whenever the threat of freeze orders or ultimate forfeiture makes retention of private counsel a practical impossibility. Defendants further contend that such a violation would occur and could be determined immediately upon the effective deprivation of counsel of choice rather than only upon a defendant's subsequent conviction. The government on the other hand contends that the indirect deprivation of private counsel of choice by governmental freeze orders or the mere threat of forfeiture under the Act would not, under any circumstances, violate this particular narrowly qualified sixth amendment right. Furthermore, says the government, just as in the case of a claim of ineffective assistance of counsel, such a claim could only be determined after a defendant's conviction.

It is this specific right to counsel of choice that the defendants and associated *amici* fix upon most strongly in claiming constitutional violation by applications of the Act's forfeiture provisions. It is also this right that courts seeking to avoid constitutional questions by statutory interpretation have thought most obviously threatened by the Act. *See, e.g., Bassett,* 632 F.Supp. at 1316; *Reckmeyer,* 631 F.Supp. at 1196; *Rogers,* 602 F.Supp. at 1348–50; *cf. Badalamenti,* 614 F.Supp. 197 (problem is not counsel of choice, but absolute denial of counsel to non-indigent by chilling effect). And it seems fair to say that the government on these appeals has recog-

nized this as the right most seriously drawn in issue by the forfeiture of attorney fees.

We agree with defendants that certain applications of the Act, properly challenged on these appeals, violate the sixth amendment right to counsel of choice and that the Act is to that extent unconstitutional. To show why requires an analysis of the nature of this particular right that examination in other contexts may not have forced.

▆▆▆▆ There is, beyond the minimal or basic sixth amendment right to *some* counsel, a component right—concededly qualified—to counsel of one's choice. *See Powell*, 287 U.S. at 53, 53 S.Ct. at 58. This means, in general, a right to retain private counsel of choice out of one's private resources, and up to the limit of those resources, free of government interference. *See United States v. Inman*, 483 F.2d 738, 739–40 (4th Cir.1973); *United States v. Burton*, 584 F.2d 485, 488–89 (D.C.Cir. 1978) ("accused who is financially able to retain counsel must not be deprived of the opportunity to do so"). Thus, while it has presumably never been attempted, it seems clear that any legislative attempt by general rule directly to put a cap on what persons accused of crimes could pay privately retained defense counsel, or to dictate the choice of private counsel by special qualification, or however, would be unconstitutional.

Indeed it is plain upon consideration of the way in which the contours of the sixth amendment's total guarantee have evolved that the right to be represented by privately retained counsel is the primary, preferred component of the basic right to *some* counsel. *See Linton v. Perini*, 656 F.2d 207, 209 (6th Cir.1981) ("essential component"). The companion right to appointed counsel has only emerged, rather late in the interpretive process, as an enforceable back-up right when available private resources do not permit exercise of the primary right. *See Powell*, 287 U.S. at 60–71, 53 S.Ct. at 60–65. It seems plain that the sixth amendment guarantee of counsel was written on the assumption that the primary right being secured against government en-

croachment was the right to be represented by counsel freely chosen and paid under private contract.

In view of some of the government's arguments in these appeals, it is well to recognize at the outset that this primary right to privately retained counsel contains anomalies that may appear singularly unfair and indeed positively undemocratic. For the primary, privately exercisable right is plainly an unequally distributed one. Some defendants, frequently the most unworthy as events demonstrate in the end, are able to hire the "Rolls-Royce of attorneys," *cf. In re Grand Jury Subpoena Duces Tecum Dated January 2, 1985 (Payden )*, 605 F.Supp. 839, 850 n. 14 (S.D. N.Y.1985) (no right to hire "Rolls-Royce of attorneys"), while others have to settle for considerably less in quality. But recognizing the anomaly ends the matter for purposes of this analysis. It is an irrelevancy once recognized, except as it necessarily defines technical indigency as the point at which the inability privately to exercise the primary right gives rise to the legally enforceable back-up right.

As indicated, this primary right is, however, a qualified one, and the nature of the right has indeed been worked out essentially in terms of the qualification. This has occurred primarily in cases where trial continuances were being sought to secure or preserve the services of privately retained counsel. In that context, *see, e.g., Ungar v. Sarafite*, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); *Sampley v. Attorney General*, 786 F.2d 610 (4th Cir.1986), the right has been held qualified by the government's countervailing interest in the orderly administration of justice, *see Ungar*, 376 U.S. at 589, 84 S.Ct. at 849–50; *Sampley*, 786 F.2d at 613; *see also United States v. Cunningham*, 672 F.2d 1064, 1074–75 (2d Cir.1982) (right protects against arbitrary disqualification of counsel). Further specific qualifications have been recognized. Perhaps the principal one is that the right is only the right to a "fair opportunity" to choose one's counsel; it is not determined by the mere whim of an accused. *See Powell*, 287 U.S. at 53, 53 S.Ct. at 58;

*Sampley,* 786 F.2d at 613. Also, the right does not embrace any guarantee of a "meaningful attorney-client relationship," *Morris v. Slappy,* 461 U.S. 1, 13–14, 103 S.Ct. 1610, 1617–18, 75 L.Ed.2d 610 (1983). In sum, it may be expressed as the right to be free of arbitrary governmental interference in choosing, paying, and retaining the services of privately retained counsel. *See Ungar,* 376 U.S. at 589, 84 S.Ct. at 849–50.

Though the essential nature of the qualified right has been worked out primarily in the context of motions for continuance of trial and for disqualification of counsel, the attributes of the right summarized above are applicable as well in the attorney fee forfeiture context. In this context, the issue is the extent to which legitimate governmental interests justify—make not arbitrary—governmental deprivation of the right of accused persons to choose and pay privately retained counsel by the indirect means of freeze orders and the Act's *in terrorem* effect upon the availability of private counsel. We accept the fact, as does the government (both in its litigation position and in the Justice Department guidelines) that the Act necessarily has that effect upon the practical ability to retain private counsel of choice.

The governmental interests asserted on these appeals are those identified in the Act's relatively sparse legislative history. Those interests are: "to preserve [by pre-conviction restraining orders] the availability of a defendant's assets for criminal forfeiture, and, in those cases in which he does transfer, deplete, or conceal his property, to assure [by the relation-back forfeiture provision] that he cannot as a result avoid the economic impact of forfeiture," Senate Report at 195–96, 1984 U.S.Code Cong. & Ad.News at 3378–79, and, more specifically, to strip racketeers and drug dealers of their "economic power bases" upon conviction, *id.* at 191, 1984 U.S.Code Cong. & Ad.News at 3374. To these specific legislative purposes, the government adds by way of argument on these appeals the manifest purpose of deterrence.

No one disputes that these governmental interests outweigh any "right" by an accused to transfer tainted property to his defense counsel, ostensibly as attorney fees but in reality as a sham to prevent forfeiture. The courts in *Bassett* and *Reckmeyer,* for example, following other district courts, saw no constitutional question respecting freeze orders and forfeiture orders directed at sham or fraudulent transfers. They found the limit of the Act's intended reach precisely on this basis.

We believe instead that though Congress intended the Act to reach further, sham or fraudulent transfers define the permissible constitutional reach of the Act in permitting the forfeiture of attorney fees. We think, that is, that these governmental interests cannot override an accused's right legitimately (i.e., without sham or fraud) to use his property, even that ultimately proven to be tainted by criminal conduct, to employ private counsel to defend him against criminal charges.

The primary right to counsel of choice must certainly, in this context, encompass that much. If it does not, it is hard to see why government might not do directly what unlimited freeze orders and the threat of forfeiture may obviously do indirectly: simply deny persons accused of certain crimes (or all crimes?) the right to employ private counsel to assist them so long as the back-up right to appointed counsel remains. This would effectively cut off the primary component of the basic sixth amendment right to counsel as we have defined it, and would obviously be unconstitutional if we have correctly analyzed the primary right. If the constitution forbids such a direct denial, it equally forbids an indirect one.

We come to the same conclusion by a process of balancing the individual interests here at stake against these asserted governmental interests. *See Sampley,* 786 F.2d at 613 (limit of the right to counsel of choice is "found in the countervailing [government] interest"). The right to counsel—whether privately retained or publicly appointed—was obviously created for protection of the guilty as well as the innocent. It must certainly have been created, therefore, on the assumption—indeed

with the sure knowledge—that in exercising the primary right to privately retained counsel, ill-gotten gains might be used by defendants who would ultimately be found guilty. Certainly this is a traditional working assumption within the legal profession and one so firmly grounded that it may well explain the incredulity of some district judges and the organized bar that Congress could possibly have intended effectively to undercut it.

Another individual interest at stake is the interest in having effectively armed private counsel, which means at the very minimum counsel sufficiently informed to mount an effective defense or otherwise provide effective assistance. This necessary assumption of the adversarial system —hence, we must believe, of the authors of the sixth amendment—is also effectively undercut—practically emasculated—by provisions of the Act which make counsel's very ability to retain legitimately contracted fees dependent upon his not being fully informed. This, it must be emphasized, goes not to the right to effective assistance of counsel, but to the primary right to representation by privately retained counsel of choice.

We do not believe that these powerful, constitutionally secured individual interests—grounded in root assumptions of our adversarial system—are outweighed in the constitutional balance by the asserted governmental interests in deterrence, in preserving property for forfeiture, and in depriving convicted persons of their economic bases for further criminal activity. We are therefore satisfied that applications of the Act which effectively deprive of the ability to retain private counsel on any basis other than sham and fraud participated in by counsel involves arbitrary action by government against which the sixth amendment provides protection. Put another way, within established doctrine, we think such applications necessarily deprive accused persons of the fair opportunity guaranteed by the sixth amendment to retain private counsel of choice.

The government's attempts to avoid this constitutional challenge do not persuade us, but their implications are instructive, for they tend to confirm our analysis. The primary governmental contention, rather uncertainly advanced, seems to be that the only constitutional protection against governmental action that effectively cuts off the ability of an accused to retain private counsel is that provided by the basic sixth amendment right to some counsel, and the further right to the effective assistance of that counsel.

According to this view, there is in this context no primary right to counsel of choice, but only a right to private counsel of choice or appointed counsel at the government's election. Beyond this, there is only a right to the effective assistance of whatever counsel is permitted by government, a right that can only be asserted after conviction and then only by testing that counsel's efforts against the minimal standards of competence and demonstrable prejudice described, e.g., in *Strickland v. Washington*, 466 U.S. 668, 687–91, 104 S.Ct. 2052, 2064–67, 80 L.Ed.2d 674 (1984).

In this way, the entire question of prejudice resulting from cutting off access to private counsel is mooted by the appointment of public counsel, and the sole question remaining is whether that counsel performed up to minimal standards, rather than the more appropriate but now unanswerable question of whether he performed as competently as would have private counsel of choice. We cannot believe that such a result is contemplated by the sixth amendment's guarantee of the right to counsel.

Attempting to denigrate the essential nature of the primary right to counsel of choice, the government points to various ways in which, without any possible constitutional violation, an accused may find himself unable to exercise that right: unwillingness of counsel to accept representation; disqualification or voluntary withdrawal of counsel; justified refusals to continue cases scheduled for trial; in rem forfeitures and jeopardy tax assessments. These examples certainly illustrate that the right is not absolute, but none has all the distinctive aspects of the in personam for-

feitures and associated freeze orders here in issue.

Refusal of particular counsel to accept representation or the withdrawal of retained counsel do not involve governmental action and, along with disqualification, leave open the possibility of further choice; freeze orders or the threat of forfeiture may cut off all ability to choose. Refusals to continue scheduled cases are only justified where the defendant is effectively to blame for failing to exercise the right of choice; forfeiture is authorized under the Act notwithstanding diligent efforts by an accused to retain counsel.

In rem forfeitures and jeopardy tax assessments, which the government contends have never been thought to violate sixth amendment rights though they too might force indigency, concededly provide close parallels. But we think that the parallels are not perfect, and in any event, we are not prepared to say and need not say here, that under no circumstances might these too violate this constitutional right. The government cites the most common example of sequestrations of contraband (the bank robber's loot) as a parallel; but of course it is not. In such cases, the government seizes property manifestly that of someone other than the accused and for preservative purposes. Forfeiture under the Act may obviously reach property of the accused to which no third party has a superior claim. The financial plight that may result to an accused from sequestration of contraband is simply of a piece with that resulting from other vagaries of life that may make it impossible to hire private counsel.

Jeopardy tax assessments, arguably upheld by at least one court against a comparable sixth amendment challenge, *see United States v. Brodson,* 241 F.2d 107 (7th Cir.1957) (en banc), provide the closest parallel. We think that these too are distinguishable from forfeitures and freeze or-

ders under the Act. But to the extent they may not be, we need not decide here whether they too might under some circumstances implicate the right to counsel of choice. The critical distinction, if one be needed, is that the jeopardy assessment has as its purpose the preservation of property already owed and wrongfully withheld from the government. In that situation, it might well be that the governmental interest in preservation of the property is more powerful than those asserted in justification of "relation-back" forfeitures of property to which the government had no claim that pre-existed the criminal conduct charged.

Finally, the government suggests that any indigency caused by freeze orders or the threat of forfeiture under the Act is not attributable to government action, but to conduct of the accused sufficiently questionable to produce grand jury or judicial determinations of probable cause. This borders on sophistry, given the obvious point that the sixth amendment guarantee applies equally to the guilty and the innocent. *See Badalamenti,* 614 F.Supp. at 198.

[11, 12] In sum, we hold that to the extent the Act authorizes freeze orders and property forfeitures whose effect is to deprive an accused of the ability to employ and pay legitimate attorney fees to private counsel to defend him against charges underlying the forfeiture, such applications violate the sixth amendment right to counsel of choice. *Cf. United States v. Thier,* 801 F.2d 1463, 1477 (5th Cir.1986) (Rubin, J., concurring specially) (Act violates substantive due process where all assets frozen). Because prejudice is presumed from the denial of counsel of choice, *see United States v. Rankin,* 779 F.2d 956, 960 (3d Cir.1986); *Wilson v. Mintzes,* 761 F.2d 275, 285 (6th Cir.1985); *United States v. Burton,* 584 F.2d 485, 491 n. 19 (D.C. Cir. 1978),[10] a violation of this right occurs and

---

10. *Flanagan v. United States,* 465 U.S. 259, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984), is not, as the government suggests, to the contrary. In holding that a criminal defendant cannot take an interlocutory appeal from an order disqualifying his counsel, the *Flanagan* Court simply ap-

plied the strong policy against allowing piecemeal review in criminal cases. It did not hold that this was because denial of the right to counsel of choice was not presumptively prejudicial, and indeed held that immediate appeal would not lie whether or not prejudice was

is remediable as soon as governmental action either directly effects or immediately threatens the unconstitutional result. *Cf. Barona Group v. Duffy*, 694 F.2d 1185 (9th Cir.1982) (threat of enforcement of ordinance creates justiciable constitutional case).

There remains the issue of how, within the Act's otherwise constitutional application, this sixth amendment right to retain private counsel of choice may be asserted and enforced. This requires some further analysis of the limits of the right and the practical protection due and available to protect it.

■ Viewed practically, the right as asserted in the context of these cases is only to retain sufficient property, free from government interference, with which to be able to pay legitimate, i.e. reasonable, attorney fees for assisting in a defense to the underlying charges. This means that to the extent an accused has sufficient property not subject to the forfeiture ultimately sought (as that will necessarily be identified by an indictment or a pre-indictment freeze order motion under § 853(e)(1)) his right to counsel of choice is not implicated by any governmental action authorized by or potentially available under the Act. On the other hand, to the extent there is not sufficient untainted property available for that purpose, protection of the use of "tainted" resources cannot be limited constitutionally by the requirement that the attorney be a "bona fide purchaser" within contemplation of § 1963(m)(6)(B); but only by the requirement that the contracted or completed transfer of property as attorney fees shall have been legitimate, i.e., not based upon a sham or fraudulent transaction.

■ In terms of practical enforcement of the right within the Act's framework,

this leads to the following. Adequate protection of the right to retain private counsel against the mere threat of forfeiture now exists by virtue of our holding that legitimate attorney fees are constitutionally protected from forfeiture. Since the "bona fide purchaser" requirement may not be applied to defense counsel seeking to protect legitimately paid attorney fees, private attorneys may undertake representation, accepting legitimate fees, without fear of suffering relation-back forfeiture of those fees. With this decision, there is thus no longer any practical necessity for anticipatory pre-conviction motions by either counsel or defendants seeking exemption of particular property from potential freeze orders or forfeiture. They need only contract for and accept legitimate fees.

Where freeze orders are sought by the government, either before or after indictment, enforcement of the right may require judicial determination of two disputable factual issues. The first is whether the defendant has sufficient resources not sought to be frozen with which to employ private counsel. If she does, there is no constitutional impediment to issuing the freeze order as requested. If the defendant does not have sufficient untainted resources, there is only the question whether "tainted" property proposed to be transferred as attorney fees is to any extent based upon a sham or fraudulent transaction as opposed to being within the range of reasonable, hence legitimate, attorney fees. Only to the extent the proposed transfer is found fraudulent—not legitimate—is any freeze order affecting such property constitutionally permissible. *See Thier*, 801 F.2d at 1475–77 (Rubin, J., concurring specially).

■ As to these potential factual issues, we believe that both the burden to

---

presumed. 465 U.S. at 269, 104 S.Ct. at 1057. While direct decision on this question was avoided by the Court, the stronger implication from its discussion of the alternative possibilities is that prejudice is presumed where counsel of choice is denied. *See Rankin*, 779 F.2d at 960 (so reading *Flanagan* ).

There is, of course, no corresponding question of the appealability of the orders in *Bassett* and

*Reckmeyer.* Both are government appeals from adverse injunctive orders entered in connection with the ancillary forfeiture provisions in the RICO and CCE statutes. Different rules of appealability apply to these as a matter of congressional policy, notwithstanding they may have some of the same untoward consequences as would interlocutory appeals by defendants.

show the availability of adequate untainted resources and the burden alternatively to show that a proposed transfer of tainted property is to any extent based upon sham or fraud should be upon the government. *See id.* at 1476–77 (burden to show availability of sufficient untainted resources should be upon government). It is the government which seeks this extraordinary remedy and which has identified the property it considers forfeitable. It should therefore bear the burden of proof on the dispositive issues. The order of proof as well as the means of proving sham or fraud and the reasonableness of attorney fees under the circumstances of particular cases must of course be left to the district courts.

### B.

The defendant in *Harvey*, as indicated, has raised a separate constitutional challenge to the Act's authorization in § 853(e)(1)(A) of *ex parte* post-indictment restraining orders without any requirement of a post-restraint hearing. Such a restraining order was issued in his case and he contends that this deprivation of his property without such a hearing violated his fifth amendment right to procedural due process.

The government contends that the indictment, based upon a finding of probable cause to believe that the property was forfeitable, supplied all the process due, or that, alternatively, the criminal trial itself, though it did not follow immediately upon the restraining order, supplied adequate post-deprivation process.

We agree with the defendant and with those other courts that have held that neither the indictment itself nor a criminal trial held, as here, three months after issuance of an *ex parte* restraining order affords the procedural due process guaranteed by the fifth amendment. *See United States v. Crozier,* 777 F.2d 1376, 1383–84 (9th Cir.1985); *United States v. Lewis,* 759 F.2d 1316, 1324–25 (8th Cir.1985); *see also United States v. Long,* 654 F.2d 911, 915 (3d Cir.1981) (government cannot rely on indictment alone to show entitlement to a pre-conviction restraining order).

Due process requires that a person not be deprived of his property without notice and opportunity for a hearing. *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Where governmental interests permit seizure before notice and hearing, they must be provided within a meaningful time thereafter. *Crozier,* 777 F.2d at 1383–84. The exact process due is determined by balancing "the risk of an erroneous deprivation, the state's interest in providing specific procedures and the strength of the individual's interest." *Crozier,* 777 F.2d at 1383; *see Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542–43, 105 S.Ct. 1487, 1493–94, 84 L.Ed.2d 494 (1985).

Post-indictment restraining orders of the kind authorized by the Act and as actually entered in Harvey's case obviously may work a tremendous hardship on accused persons. Stripped of all or major portions of his financial resources, an accused (unless in detention) may be unable pending and throughout trial to provide for the basic necessities of life and whether or not in detention, to provide for the preparation of his legal defense. The defendant's interest is obviously a powerful one, and the risk of an erroneous deprivation substantial. On the other hand the government's interest in providing a particular form of procedure is certainly no different after indictment than in the pre-indictment setting. No reason appears why the government would be unduly burdened or any public interest disserved by providing the same sort of immediate post-deprivation hearing in the post-indictment setting as is required in the pre-indictment setting by § 853 or as is contemplated by Fed.R.Civ.P. 65.

The indictment itself obviously does not afford the type adversary hearing required by due process, though it may suffice as adequate notice and as a sufficient justification for entering the restraining order *ex parte. See Thier,* 801 F.2d at 1469. Neither does a criminal trial held, as here, as much as three months after the *ex parte* order, provide a hearing within a meaningful time.

We therefore hold that to the extent the Act authorizes the issuance of *ex parte* restraining orders after indictment without any post-deprivation hearing other than a criminal trial, it violates fifth amendment due process guarantees, and that as applied specially in Harvey's case, it violated his fifth amendment rights to procedural due process.

## V

It remains to apply the above conclusions, including those of constitutional violation, to dispose of the three cases before us.

### A.

*Basset*, No. 86–5069.

The order from which the government appeals in this case is one entered upon the pre-trial motion of defendants to exempt property sufficient to pay their legal fees from forfeiture, made in response to the Government's notification that it would seek forfeiture of those fees upon defendants'/convictions. As noted above, the district court granted the motion on the basis that forfeiture of attorney fees was not intended under the Act in the absence of sham or fraud; and on a finding that there was no sham or fraud associated with the payment of the fees in question.

We have held that property forfeitable under the Act's provisions which has been contracted for or paid as attorney fees may constitutionally be forfeited or restrained

from transfer only when and to the extent the fee transaction was a sham or fraudulent one. Here, though on a different basis, the district court has made findings, not challenged, that the fee transaction with appellees' counsel was not infected by sham or fraud.

Accordingly, though on the constitutional ground adopted in this opinion, rather than the district court's statutory interpretation ground, we affirm the district court's order exempting legitimate counsel fees from restraining orders and forfeiture. This must, however, be without prejudice to the Government's right to seek forfeiture, following conviction, of any portion of the aggregate of fees paid which are not legitimate in the sense here discussed.

### B.

*U.S. v. Caplin & Drysdale (Reckmeyer)*, No. 86–5050.

■■■ The order from which the government appeals in this case is one entered upon the third-party claim of defendant Reckmeyer's counsel,[11] following Reckmeyer's conviction by guilty plea, seeking exemption under § 413(n) of the CCE Act, of legal fees paid to counsel and, in part, held in escrow pending the conviction. As indicated above, the district court granted exemption on the basis, as in *Bassett*, that the Act did not contemplate forfeiture of legitimate attorney fees, the legitimacy of those in issue not having been questioned.

---

**11.** Counsel's standing to raise the constitutional issues by this m/eans has been obliquely questioned by the government, both in the district court and on these appeals. We have considered the matter and conclude that standing clearly exists in counsel to raise the counsel of choice issue derivatively. There are of course prudential concerns about standing to assert constitutional rights derivatively, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 2971, 86 L.Ed.2d 628 (1985), but they are not present here. There has been a preexisting relationship between counsel as litigant and their client as possessor of the right that insures effective derivative presentation of the constitutional claim, *see Singleton v. Wulff*, 428 U.S. 106, 114–15, 96 S.Ct. 2868, 2874–75, 49 L.Ed.2d

826 (1976); failure to adjudicate the constitutional rights derivatively asserted would dilute or adversely affect those rights, *see Craig v. Boren*, 429 U.S. 190, 196, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976); and the rights of the litigant and the possessor of the right are obviously intimately connected and bound together, *see id.*

Furthermore, we reject any suggestion that by continuing their representation, counsel effectively mooted or waived derivatively any claim of denial of counsel of choice. Under the circumstances, counsel resolved an ethical dilemma by remaining in the case at considerable financial risk, in order, among other things, to challenge the forfeiture provisions. We will not hold that this resolution made the constitutional claim, timely raised, no longer justiciable.

Here, as in *Bassett,* we affirm, though on constitutional rather than statutory grounds.[12]

## C.

*Harvey,* No. 86–5025.

In this appeal, Harvey seeks to challenge his conviction on the grounds that the *ex parte* post-indictment restraining order both violated his sixth amendment right to counsel of choice and to the effective assistance of counsel, and his fifth amendment right to procedural due process.

### (1)

■ As to the sixth amendment challenge on ineffective assistance grounds, we hold, in line with our traditional approach, that it is not properly made on this direct appeal, but may properly be made only in a collateral proceeding under 28 U.S.C. § 2255. *United States v. Fisher,* 477 F.2d 300, 302 (4th Cir.1973). This case is quintessentially one in which the record of trial court proceedings does not adequately develop the facts necessary to consider whether the restraining order here challenged actually resulted in ineffective assistance of counsel and, if so, whether actual prejudice occurred under the test of *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984).

■ The attempted challenge on denial of counsel of choice grounds presents a more difficult problem. Under our decision today, the restraining order entered here, being based on no finding of sham or fraud in respect of the attorney fees it affected, may technically have violated Harvey's sixth amendment right to counsel of choice.

But there is the great complexity here that his counsel of choice was kept in the case—though in somewhat altered identity and reduced numbers—by the device of appointment. From this, the government argues that any technical violation of the right to unfettered choice of particular counsel in particular numbers is demonstrably harmless beyond a reasonable doubt where as here, substantial identity and numbers are preserved by the appointment device. To this, Harvey responds, that, as we have now held, denial of counsel of choice is one of those constitutional errors that is *per se* prejudicial, i.e., not subject to harmless error excuse. On this basis, he says, he is entitled to immediate reversal of his conviction for the constitutional violation that manifestly occurred.

Without doing violence to the constitutional principle on which our decision is based, we need nevertheless to deal realistically and practically with the narrowly specific problem that was raised in this case but will not recur in light of our decision today. It will not recur because indigency requiring appointment of counsel can no longer be forced by restraining orders or the threat of forfeiture of legitimate attorney fees. While it did occur here, the appointment of substantially the same counsel that had been privately retained makes any constitutional violation of this particular right in this case at least arguable. Where substantially the same counsel has been substituted, the more serious question is whether the reduced fees and support resources that resulted may have resulted in significantly reduced effectiveness of counsel. This, we conclude, can fully and properly be considered only in connection with any collateral claim of ineffective assistance of counsel that may be

---

12. Theoretically, under our constitutional holding, the government might have avoided exemption by proving, as an alternative to sham or fraud in the fee transaction, that Reckmeyer had available sufficient untainted resources so that the forfeiture of those resources identified in the restraining order and indictment could not have violated his right to counsel of choice (laying aside the separate point that here his counsel of choice remained in the case). That

being so, it might be thought that the government should yet have the right, in view of this decision's later advent, to make such a showing if it can. This would of course require a remand opening the district court's order, rather than an outright affirmance. In view of the breadth of the forfeiture, however, we believe that this would be an empty formality, and decline, in the interests of finality, to remand for such a purpose.

made under 28 U.S.C. § 2255, and to that we relegate the question.

### (2)

■ We have held that the post-indictment *ex parte* restraining order violated Harvey's procedural due process rights for want of an adequate post-deprivation hearing within a meaningful time.

This, of course, is error that does not go to his conviction, but only to the deprivation of his property without procedural due process. Consequently, reversal of Harvey's conviction is not an appropriate remedy for this error. *See United States v. Ray,* 731 F.2d 1361, 1366 (9th Cir.1984). Nor, so long as his conviction and the accompanying order of forfeiture stand, would Harvey be entitled to vacation of the restraining order, the error in its entry having been rendered harmless by the later jury determination of forfeitability. *See id.; cf. United States v. Crozier,* 674 F.2d 1293, 1298 (9th Cir.1982) (comparable error remediable before trial by vacation of restraining order). Whether Harvey might under any present or future circumstances have a civil remedy for the temporary violation of his procedural due process rights is of course not before us.

### VI

For the above reasons, we affirm the order exempting attorney fees from forfeiture in No. 86–5069, *United States v. Bassett & Meredith,* without prejudice to the government's right in further proceedings to seek forfeiture of any other property or funds transferred as attorney fees in sham or fraudulent transactions; we affirm the order exempting attorney fees from forfeiture in No. 86–5050, *United States v. Caplin & Drysdale (Reckmeyer* ); and we affirm the conviction in No. 86–5025, *United States v. Harvey,* without prejudice to the right of the defendant to challenge the conviction in collateral proceedings under 28 U.S.C. § 2255 on the constitutional grounds sought to be asserted on this direct appeal.

SO ORDERED.