In re FORFEITURE HEARING AS TO
CAPLIN & DRYSDALE,
CHARTERED, Claimant,

UNITED STATES of America,
Plaintiff–Appellant,

v.

CAPLIN & DRYSDALE, CHARTERED,
Claimant–Appellee,

and

Christopher F. Reckmeyer, II; Robert Bruce Reckmeyer, Defendants,

National Association of Criminal Defense Lawyers (NACDL); National Legal Aid and Defender Association (NLADA); and American Bar Association (ABA); Amici Curiae.

No. 86–5050.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 6, 1987.

Decided Jan. 11, 1988.

Samuel Rosenthal, Chief, Appellate Section, Crim. Div., Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Peter Van Norden Lockwood, Washington, D.C., for claimant-appellee.

Eugene C. Thomas, President, American Bar Ass'n, Boise, Idaho, Charles G. Cole, Steven H. Goldblatt, Terrance G. Reed, Washington, D.C., on brief, for amicus curiae American Bar Ass'n.

Peter Cohen, Washington, D.C., on brief for amicus curiae Nat. Legal Aid and Defender Ass'n.

Leonard Stamm, Maryland Crim. Defense Attys. Ass'n, Neal R. Sonnett, Benedict P. Kuehne, Bierman, Sonnett, Shohat & Sale, P.A., Miami, Fla., on brief for amicus curiae Nat. Ass'n of Crim. Defense Lawyers and the Maryland Crim. Defense Attys. Ass'n.

Before WINTER, Chief Judge, and RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, ERVIN, CHAPMAN, WILKINSON and WILKINS, Circuit Judges, sitting in banc.

WILKINSON, Circuit Judge:

This case presents a Sixth Amendment challenge to the application of the criminal forfeiture provisions of the Continuing Criminal Enterprise (CCE) statute, 21 U.S.C. § 853, to defense attorneys' fees. Appellee Caplin & Drysdale contends that forfeiture of attorneys' fees violates the Sixth Amendment right to the assistance of counsel. We reject this challenge because there is no established Sixth Amendment right to pay an attorney with the illicit proceeds of drug transactions. The difficult policy choices posed by application of the forfeiture statutes to attorneys' fees provide no basis for the creation of such a right. Those choices are properly the concern of Congress, not the federal courts, and the plain language of the criminal forfeiture provisions indicates that Congress did not intend for attorneys' fees to be exempted.

## I.

### A.

The Comprehensive Forfeiture Act of 1984 (CFA), Pub. L. No. 98–473, 98 Stat. 2040 (1984), revised the forfeiture provisions of both the RICO and CCE statutes. This case concerns only a CCE prosecution, but the RICO provisions are basically identical. The CFA generally expanded the type of property that is subject to forfeiture, the crimes that can give rise to forfeiture, and prosecutors' ability to restrain property transfers by defendants both before and after indictment. Restraining orders under the CFA allow courts to enjoin defendants or their associates from moving money out of the courts' reach prior to a conviction so as to escape forfeiture. *See* 21 U.S.C. § 853(e).

Critical to this case is the CFA's "relation back" provisions, under which forfeiture occurs at the time an offense is *committed:*

(c) All right, title, and interest in property described in subsection (a) of this section vests in the United States upon the commission of the act giving rise to forfeiture under this section. Any such property that is subsequently transfer-

red to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States ...

21 U.S.C. § 853(c). The government thus takes the forfeited property that was in the hands of the defendant at the time of the offense, not at the time of conviction. Application of this provision to fees paid to an attorney prior to a conviction results in forfeiture of the fees, because the government's interest in the property predates the transfer to the lawyer.

The CFA allows a third party such as the attorney to assert an interest in the forfeited property in a post-forfeiture hearing. The third party can prevail only if:

(B) The petitioner, is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of the purchase reasonably without cause to believe that the property was subject to forfeiture under this section.

21 U.S.C. § 853(n). Thus, if attorneys or other third parties can meet the requirements of § 853(n), they may retain property that would otherwise belong to the government under § 853(c).

### B.

This controversy over attorneys' fees arose during the tax and CCE prosecution of Christopher Reckmeyer. Reckmeyer controlled an illicit drug operation that employed over twenty people, distributed tons of marijuana and hashish, and created business entities that laundered drug profits through various types of transactions. Reckmeyer's plea agreement stated that his organization was responsible for the distribution of more than 169 tons of marijuana and ten tons of hashish over the course of fifty ventures. Reckmeyer realized millions of dollars from drug transactions, which were his only significant source of income. *See United States v. Reckmeyer,* 786 F.2d 1216, 1217, 1222 (4th Cir.1986).

During the summer of 1983, eighteen months prior to his indictment in the Eastern District of Virginia, Reckmeyer retained the law firm of Caplin & Drysdale.

On January 14, 1985, the government obtained an *ex parte* restraining order under the CCE statute preventing any transfer of Reckmeyer's assets. One day later the government filed an indictment that sought forfeiture of virtually all of Reckmeyer's assets. Reckmeyer made regular fee payments to Caplin & Drysdale. One of these payments consisted of approximately $25,-000 in cash, delivered to the firm on January 25, 1985, the day Reckmeyer surrendered to authorities. The firm notified the court of the receipt of the funds, which were then deposited in an escrow account. After the indictment, Caplin & Drysdale continued to represent Reckmeyer at his request.

Reckmeyer pled guilty to three counts of the indictment on March 14, 1985. On the following day, the district court denied Caplin & Drysdale's motion to exempt its fees from a post-indictment restraining order that had been issued in January. The court ruled that because Reckmeyer had pled guilty, Caplin & Drysdale could claim its fees only through the post-forfeiture hearing provided to third parties by § 853(n). Upon Reckmeyer's conviction on May 17, 1985, the court entered a forfeiture order encompassing virtually all of Reckmeyer's assets, including the $25,000 held in escrow. One month later, Caplin & Drysdale filed a third-party claim for $170,-000 in unpaid legal fees. Caplin & Drysdale asserted that CCE forfeiture does not encompass fees paid for legal defense services actually rendered, and that if the statute does encompass fees, it violates the Fifth and Sixth Amendments.

The court granted Caplin & Drysdale's third-party claim, holding that Congress did not intend for the forfeiture provisions to reach fees paid for actual services. *United States v. Reckmeyer*, 631 F.Supp. 1191 (E.D.Va.1986). The court further stated that an interpretation of the statute that allowed fee forfeiture would violate the defendant's right to counsel of choice and to effective assistance of counsel. *Id.* at 1196. The government appealed, and the case was consolidated for argument with two others. A panel of this court affirmed the district court, holding that the CFA does apply to attorneys' fees, but that the statute is to that extent unconstitutional because it violates the Sixth Amendment right to counsel of choice. *United States v. Harvey*, 814 F.2d 905 (4th Cir.1987). This court granted rehearing en banc in the *Caplin & Drysdale* case alone.

II.

The threshold question in this case is whether the CFA permits the forfeiture of attorneys' fees. As to that issue, we endorse the panel opinion in *Harvey* and briefly summarize its conclusions. The panel opinion noted that the CFA's language is unmistakably clear, and so plainly reaches property used or intended to be used for attorneys' fees that the inquiry should end without resort to legislative history. In any event, the legislative history provides no basis for concluding that attorneys' fees are not subject to forfeiture under the terms of the CFA. *Harvey*, 814 F.2d at 913–18.

■ The language of the forfeiture statute makes no mention of attorneys' fees, either in its definition of property that is subject to forfeiture in sections 853(a) and (b), or in its provision for third-party claims of exemption in § 853(n). The clear terms of the statute subject a defendant's assets to forfeiture without regard to whether he intends to use them to pay an attorney. Similarly, the statute exempts only those third parties who have prior claims or are bona fide purchasers, without regard to whether they are attorneys. Where, as here, a statute's language is unambiguous, the court's task of statutory construction is at an end unless enforcement of the literal language would contravene a clearly expressed legislative intention. *Russello v. United States*, 464 U.S. 16, 20, 104 S.Ct. 296, 298, 78 L.Ed.2d 17 (1983).

■ The legislative history of the CFA reveals no congressional intent that would require exemption of attorneys' fees from the reach of the statute. Some courts have seized upon passages in the legislative history expressing the need to prevent defendants from avoiding forfeiture through

sham transactions. From these passages, the courts have concluded that forfeiture is to apply to attorneys' fees *only* if the funds were given to the attorney not in return for services, but in order to fraudulently harbor them from forfeiture. *See United States v. Estevez*, 645 F.Supp. 869 (E.D.Wis.1986); *United States v. Ianniello*, 644 F.Supp. 452 (S.D.N.Y.1985); *United States v. Badalamenti*, 614 F.Supp. 194 (S.D.N.Y.1985); *United States v. Rogers*, 602 F.Supp. 1332 (D.Colo.1985). Congressional disapproval of a specific type of conduct cannot, however, legitimately be used to restrict statutory language that is unambiguously more broad. *See Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 110–11, 100 S.Ct. 2051, 2057–58, 64 L.Ed.2d 766 (1980); *Harvey*, 814 F.2d at 916.

■ Further, limiting forfeiture to assets transferred in sham transactions would read the bona fide purchaser requirement right out of the statute. Section 853(n) plainly says that only those who purchase property for value and without cause to believe that it was subject to forfeiture shall be exempt from an order of forfeiture. The specific listing of the assets in the indictment and the payment of their fee in cash gave the attorneys representing Reckmeyer ample cause to know that the funds were forfeitable under 21 U.S.C. § 853. They have acknowledged that they have no claim to make under the clear terms of § 853(n).

### III.

■ We next turn to Caplin & Drysdale's constitutional claims. Although no problems of standing attend Caplin & Drysdale's claim of a statutory exemption for their fees, we recognize as an initial matter that the firm's constitutional claims are in one sense raised in the abstract. Caplin & Drysdale's assertion of Sixth Amendment rights arises out of a prosecution in which the defendant has undeniably received every benefit conveyed by the Amendment. Reckmeyer was not only represented by counsel, but the counsel of his choice. So far as the record indicates, that representation was effective.

Nonetheless, we believe this case presents a justiciable controversy. Caplin & Drysdale has approximately $170,000 at stake here. It faces the "concrete injury" of the loss of that sum, a loss that is clearly occasioned by the government's application of the forfeiture statute and would just as clearly be redressed by the finding of unconstitutionality that the law firm urges. The elements of injury, causation, and redressability are all present, and the constitutional requirements for standing under Article III are thus satisfied. *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).

Caplin & Drysdale is therefore a proper party to assert Sixth Amendment objections to fee forfeiture, subject only to the prudential concerns raised by third party assertions of constitutional rights. The Supreme Court has emphasized two prudential concerns with third party standing: the concern that constitutional rights not be litigated unnecessarily, and the concern that a third party may not advocate the right as effectively as its actual holder. *See Singleton v. Wulff*, 428 U.S. 106, 113–14, 96 S.Ct. 2868, 2873–74, 49 L.Ed.2d 826 (1976).

In this case, each of the factors developed by the Court to address these prudential concerns plainly points to a decision on the merits. The interests of the defendant in hiring a lawyer and the interest of the lawyer in receiving a fee are "inextricably bound" together. *Id.* at 114, 96 S.Ct. at 2874. The assertion of this constitutional claim is extremely important to Caplin & Drysdale, criminal defendants, and the bar, and its resolution is in no way "unnecessary." Caplin & Drysdale is fully "as effective a proponent" of the right asserted as the defendant. *Id.* at 115, 96 S.Ct. at 2874. The firm's interest in its fee and in the future effects of fee forfeitability ensure ample incentives for proper adversarial presentation of the issues. Further,

these issues have already been forcefully argued by the parties, decided by a district court, and reviewed by a panel of this court. The prudential concerns strongly favor the resolution of this issue by the en banc court, and we therefore turn to the merits of Caplin & Drysdale's claim.

### IV.

■ In addressing Caplin & Drysdale's constitutional challenge, we emphasize at the outset that forfeiture of attorneys' fees poses no threat whatsoever to the absolute right to be represented by counsel. This right to representation is fundamental to our system, and universally recognized as an "immutable principle of justice" implicit in due process. *Powell v. Alabama,* 287 U.S. 45, 71, 53 S.Ct. 55, 65, 77 L.Ed. 158 (1932). From its Fourteenth Amendment origins in *Powell,* this principle has been refined, and its application broadened, in a series of cases construing the specific guarantee of counsel in the Sixth Amendment. It has come to mean that a criminal defendant has the absolute right to representation *either* by retained counsel or by appointed counsel in a proceeding that threatens imprisonment. *See, e.g., Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Chandler v. Fretag,* 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4 (1954); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed. 2d 799 (1963); *Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972).

There is no argument here over whether forfeiture can operate to deny a defendant this absolute right to representation—it cannot. At most, the Comprehensive Forfeiture Act can render a defendant unable to secure private counsel through a restraining order or the threat of future forfeiture of illicit funds. Should this occur, the defendant's right to representation will be protected by the appointment of counsel. The result here will have no effect on the basic and absolute Sixth Amendment right of CCE defendants to representation.

Some courts have suggested that forfeiture could violate this absolute right to representation where a defendant is unable to hire an attorney with assets in his possession due to potential forfeiture, but is unable to secure appointed counsel because he is not technically indigent. *See, e.g., United States v. Badalamenti,* 614 F.Supp. 194 (S.D.N.Y.1985). While it is true that Criminal Justice Act appointments are based on financial inability, *see* 18 U.S.C. § 3006A(a), the spectre of drug defendants being tried and convicted pro se is hardly realistic. No criminal defendant can be made to stand trial without counsel for any reason. *E.g., Powell, supra.* Which form that representation may take is debatable, but the absolute right to representation is not.

■ We cannot accept, however, the suggestion appearing throughout Caplin & Drysdale's argument that the presumption of innocence forbids any interference with a defendant's property prior to a verdict of guilty beyond a reasonable doubt. Forfeiture, like other pretrial deprivations, is problematic in that it can interfere with the use of property that is merely *alleged* to be illicit, and thus owned by the government. The fact that no trial has yet been held does not mean, however, that the government is powerless to protect the public interest in any way that interferes with liberty or property. To assign such a value to the presumption of innocence would mean, for example, that there could be no arrests, and certainly no pretrial detention of defendants. Just as the government may restrain liberty to prevent the flight of a suspect, *Bell v. Wolfish,* 441 U.S. 520, 534, 99 S.Ct. 1861, 1871, 60 L.Ed.2d 447 (1979), it may restrain property to prevent the flight of forfeitable assets. The presumption of innocence is of undoubted importance in assigning the burden of proof at trial, but it is not a grant of immunity from pretrial inconvenience. *Id.* at 533, 99 S.Ct. at 1870.

■ Pretrial deprivations of liberty or property must, of course, be imposed in accordance with the requirements of due process. The strictures of due process do not, however, convey an absolute right to be free of pretrial deprivations, just as the procedural protections of the Fourth

Amendment do not convey an absolute right to hold one's property free of lawful searches and seizures. *Cf. Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (allowing seizure not only of fruits and instrumentalities of crime, but also of "mere evidence"). If there is any general objection to be made to forfeiture as a pretrial deprivation, it must be based on the *procedures* involved, not on a general right to be free from all restraint on liberty and property. No such procedural due process challenge is before us today.

The government has a strong interest in seeing that criminal assets are not dissipated prior to trial. Thus, no one would argue that the government must allow a defendant to use contested assets to purchase most categories of consumable services or goods. Neither restraining orders nor a merchant's refusal to sell to the defendant for fear of future forfeiture violates that defendant's rights. Given that the government may take steps to prevent these types of expenditures prior to a verdict, we are left with the question whether the Sixth Amendment forbids interference with an expenditure for the specific purpose of hiring a lawyer. For the reasons that follow, we hold that it does not.

## V.

█ Both parties and courts have focused on the qualified right to counsel of choice as the basis for the proposed requirement that attorneys' fees be constitutionally exempt from forfeiture. Courts have recognized this right to counsel of choice as an independent right, expressed as the "right of any accused, if he can provide counsel for himself *by his own resources* or through the aid of his family or friends, to be represented by the attorney of his choosing." *United States v. Inman,* 483 F.2d 738 (4th Cir.1973) (emphasis added). As stated by the *Harvey* panel opinion, this "means, in general, a right to retain private counsel of choice *out of one's private resources,* free of government interference." *Harvey,* 814 F.2d at 905–923 (emphasis added). This right is a "quali-

fied" right, defined primarily in cases where a defendant has sought a continuance in order to hire new counsel, and it is limited by the government's interest in the orderly administration of justice. *See, e.g., Sampley v. Attorney General of North Carolina,* 786 F.2d 610 (4th Cir.1986); *Inman, supra.*

We need not reach the question of how this right is qualified, however, for it simply does not apply at all in the fee forfeiture context. Each and every prior case applying the right to counsel of choice has assumed as its starting point that the defendant wished to hire counsel with *his own assets.* Here, this assumption is conspicuously absent. The very point of the inclusion of forfeiture in an indictment is the government's assertion that the assets possessed by a defendant are not legally his own, but the fruits of crime in which the law recognizes no ownership rights of the defendant. Forfeiture is not an attempt to punish those with legal assets by denying them an attorney; it is an assertion that the defendant does not have the legal assets that entitle him to a right to counsel of choice in the first place.

█ The fact that the government contests the legal ownership of the assets is crucial. The government could not, for example, simply restrain funds to which it claims no legal entitlement so as to force a defendant to accept appointed counsel. *See United States ex rel. Ferenc v. Brierley,* 320 F.Supp. 406 (E.D.Pa.1970). For this reason, fee forfeiture is not, as the *Harvey* panel has suggested, the constitutional equivalent of a government-imposed cap on spending for defense counsel or a law requiring those charged with certain crimes to rely on appointed counsel. In these situations, the government attempts to restrict the defendant's use of his own undisputed assets. In the fee forfeiture context, the assets sought by the government are alleged to be an integral part of the very crime with which the defendant is charged. *See* 21 U.S.C. § 853(a) (providing for forfeiture of property "constituting, or derived from" proceeds of drug transactions, property "used or intended to be

used" to commit drug violations, and property "affording a source of control over" a drug enterprise). The government seeks to deny use of the property not as a mere penalty, but because the assets are themselves illicit.

■ The right to counsel of choice belongs only to those with legitimate assets. The right to counsel does not guarantee that every defendant will have the lawyer he desires. Rather, the Constitution reflects the "harsh reality that the quality of a defendant's representation frequently may turn on his ability to retain the best counsel money can buy." *Morris v. Slappy,* 461 U.S. 1, 23, 103 S.Ct. 1610, 1622, 75 L.Ed.2d 610 (1983) (Brennan, J., concurring). The Sixth Amendment assures the fact of representation. Equality of representation has been thought a goal beyond constitutional attainment. Those with their own funds must be given the fair opportunity to secure counsel up to the limit of their funds; those without assets of their own must be satisfied with appointed counsel, over whose selection they may have little influence. *See generally,* Tague, An Indigent's Right to the Attorney of His Choice, 27 Stan.L.Rev. 73 (1974). Inevitably, there are multitudinous circumstances and conditions that may remove a defendant from the class of persons who have a right to choose their lawyers, but that will not thereby infringe his Sixth Amendment rights.

■ Purely private predicaments may leave a defendant without the counsel of his choice. Any attorney may decline to accept a case despite the fact that he was chosen by a defendant. This decision may be made for the simple financial reason that the attorney does not expect the defendant to be able to pay. The possibility also exists that a creditor might obtain liens against a criminal defendant's property, preventing the defendant from hiring a lawyer. Rules imposed by the government may likewise prevent the hiring of chosen counsel. Rules requiring appointment of local counsel may have this effect. *See Ford v. Israel,* 701 F.2d 689, 692–93 (7th Cir.1983). Court-imposed scheduling may

also prevent participation by chosen counsel. *See Inman,* 483 F.2d at 740. No Sixth Amendment violation exists in any of these situations, yet one is claimed where forfeiture produces the same result.

Forfeiture, in our view, is another of those events that may prevent a defendant from choosing his counsel but does not involve any denial of the qualified Sixth Amendment right to counsel of choice. The most relevant analogy, though rejected by the panel in *Harvey,* is to the example of bank robbers' loot. Suppose a bank is robbed and $100,000 taken. A defendant is arrested in possession of $100,000 and nothing more. The defendant protests his innocence and claims, without the slightest proof, that the $100,000 was in fact a gift from a friend. Surely no one will contend that the $100,000 must be made available to pay the defendant's lawyer, and not be kept available for return to the bank in the event the defendant is found guilty. Yet this is exactly the result that Caplin & Drysdale asserts must be guaranteed to the drug defendant. We reject this claim, for the situations are equivalent, and in each the government may legitimately take steps to preserve the contested assets. In each the defendant is entitled to representation by an appointed attorney if he has no uncontested assets available for securing private counsel.

The panel opinion attempted to dismiss the parallel between illicit drug proceeds and robbers' loot, but in our view it did not, and could not, succeed. The opinion states that the situations are different because the property seized from the bank robbery defendant is "manifestly that of someone other than the accused." *Harvey,* 814 F.2d at 926. But this will not always be the case: the robber may have deposited the proceeds in his own account or otherwise disguised them. Similarly, the assets sought to be forfeited from a CCE defendant may well be "manifestly" illicit, as is the case where the defendant has piles of cash and no records of any legitimate income whatsoever. Yet the broad constitutional rule that we are invited to create— outright exemption from forfeiture for all

fees that are for services rendered, *see Harvey*, 814 F.2d at 927—would require release of the illicit assets to the defendant's chosen lawyer.

The *Harvey* panel also emphasized that CCE assets are not asserted to be those of a third party such as a bank, but merely those of the United States. The government, like other litigants, however, may assert an interest in property to which it claims a legal entitlement. This is certainly true where that entitlement is specifically conveyed to further the imperative task of fighting organized drug enterprises. Civil forfeiture and jeopardy tax assessments are relevant analogies here. Several cases have persuasively rejected claims that jeopardy assessments causing inability to hire counsel violate the Sixth Amendment. *See United States v. Brodson*, 241 F.2d 107 (7th Cir.1957) (rejecting claim that jeopardy assessment preventing retention of counsel necessarily violates Sixth Amendment and rejecting as "immaterial" for purposes of a due process claim any distinction between indigency and "government-imposed" indigency); *see also United States v. Marshall*, 526 F.2d 1349 (9th Cir. 1976) (rejecting any requirement that alternative funds for counsel be made available to a defendant whose assets were under a tax levy absent a showing of prosecutorial misconduct); *United States v. Allied Stevedoring Corp.*, 138 F.Supp. 555 (S.D.N.Y. 1956) (rejecting corporation's claim that funds must be released from tax levy so that it could pay for chosen counsel, stating that counsel could be appointed if necessary). We similarly reject Caplin & Drysdale's claim that the Sixth Amendment forbids forfeiture proceedings that render a defendant indigent. In such a situation, Sixth Amendment requirements are satisfied by the availability of appointed counsel.

We thus decline to expand the qualified right to counsel of choice to an absolute right to retain counsel with illegally acquired assets. The dissent suggests that it is the enormity of the class of crimes at issue that forms "the lynchpin of the majority's constitutional analysis." To the contrary, we do not single out any class of defendants for disfavored treatment. We simply decline the invitation of the dissent to accord this class of criminal defendants a unique and favored constitutional status. Such a rule would constitutionally prefer the drug merchant with none but illicit assets not only to indigent defendants but to defendants with untainted assets, who must sacrifice them to secure the counsel of their choice. An outright exemption of attorneys' fees from forfeiture would impose a regime of stark inequality whereby those most successful in harvesting the fruits of criminal activity would be those most able to secure representation others are not constitutionally guaranteed and cannot personally afford.

Our conclusions have been well stated by a leading commentator on fee forfeiture:

Criminal defendants have no sixth amendment right to demand that crime-related assets be kept available to pay for privately retained counsel. The sixth amendment guarantees only the right to use *legitimate* assets to obtain the assistance of counsel. If the defendant has no assets, the sixth amendment requires the appointment of counsel. It does not prevent prosecution of the indigent or require the government to provide the wherewithal to retain private counsel of choice.

Brickey, *Forfeiture of Attorney's Fees: The Impact of RICO and CCE Forfeitures on the Right to Counsel*, 72 Va.L.Rev. 493, 533 (1986). Nothing in the Sixth Amendment requires what Caplin & Drysdale requests—a constitutional right to use criminal assets to hire counsel.

## VI.

 We hold, therefore, that forfeiture defendants may be required to rely on appointed counsel if they do not have sufficient uncontested assets to hire a private attorney. We likewise reject the contention that appointed counsel are presumptively unqualified to handle Continuing Criminal Enterprise cases.

To accept the argument that appointed counsel cannot provide a constitutionally

adequate defense in CCE cases would lead to the absurd result that the government could not prosecute drug defendants apprehended with no funds in their possession, for prosecution would be unconstitutional if the defendants could not afford firms specializing in the defense of drug offenders. *See* Brickey, *supra,* at 521. That forfeiture may place strains on public defenders' offices and Criminal Justice Act resources may be problems of policy, but they give this court no warrant to create new constitutional rules. There exist no grounds for a constitutional presumption of incompetence on the part of appointed counsel. *See United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). In a specific case in which a defendant receives ineffective assistance at trial, he can challenge his conviction on that well-established basis. *See Cronic, supra; Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

We similarly cannot accept the assertion that fee forfeiture is unconstitutional per se because where a defendant *is* able to hire counsel it will create impediments to attorney-client communication and conflicts of interest. Where a defendant has been able to hire a lawyer of his choice, claims of interference in his relationship with that lawyer must at most be claims of government-caused ineffective assistance. Such claims may be properly reviewed only on the individual facts of a particular case. *Cf. United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981); *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) (both rejecting claims of a per se Sixth Amendment rule against interference in attorney-client relationship). Claims of ineffective assistance are generally to be resolved through an inquiry into the fairness of a particular prosecution, and not by per se rulemaking. *See United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We will not declare fee forfeiture per se unconstitutional on the basis of such speculative dangers to attorney-client cooperation.

Our decision not to declare fee forfeiture per se unconstitutional is bolstered by the fact that the impediments to communication and the potential for conflicts of interest are more theoretical than real. It is difficult to believe that, despite their professional obligations as defense lawyers, retained counsel will somehow attempt to go to trial with incomplete knowledge of a case so as to preserve "bona fide purchaser" status in the event of a forfeiture. Further, the Justice Department Guidelines for use of the forfeiture statutes minimize the possibility of this unlikely occurrence. Under the Guidelines, a prosecutor cannot pursue forfeiture of actual fees without reasonable grounds to believe that the attorney had *actual knowledge* that the *particular asset* with which he was paid was subject to forfeiture. *See* Justice Department Guidelines on Forfeiture of Attorney's Fees, 38 Crim.L.Rep. (BNA) 3001, 3004 (1985). Under this standard, if a defendant has any uncontested assets, the attorney should be able to satisfy himself that he is paid out of these assets with little difficulty, and thus have no fear of fee forfeiture. On the other hand, where an attorney chooses to accept payment in assets named in a forfeiture indictment or a huge cash sum, any later attempts to avoid knowledge would be insufficient to qualify the attorney as a bona fide purchaser.

The notion that defense attorneys will behave unethically as a result of potential forfeiture is also highly speculative. Caplin & Drysdale argues that defense counsel will enter into plea agreements carrying long prison terms for the client in return for a lessened forfeiture verdict that preserves their fee. We refuse to presume that members of the bar will act in such an unethical fashion, even assuming that they could convince their client and the court to approve. *Cf. Evans v. Jeff D.,* 475 U.S. 717, 106 S.Ct. 1531, 1537, 89 L.Ed.2d 747 (1986) (rejecting argument that allowing waiver of attorneys' fees in § 1983 cases would lead attorneys to violate ethical obligations to their clients in order to protect their fees). We do not doubt that fee for-

feiture will have important implications for defendants and lawyers alike, but these implications cannot justify declaring fee forfeiture per se unconstitutional.

 Finally, the possibility that a prosecutor might abuse the forfeiture statutes in a particular case does not justify holding all fee forfeiture unconstitutional. Courts have ample tools for dealing with situations where prosecutorial misconduct threatens the fairness of a trial. Due process claims of this type must, however, be dealt with on specific facts. Every criminal law carries with it the potential for abuse, but a potential for abuse does not require a finding of facial invalidity.

## VII.

The arguments advanced against fee forfeiture are in truth nothing more than an invitation for this court to make its own policy under the guise of creating a new constitutional right. Fee forfeiture does indeed raise many complex problems concerning access to defense counsel, the attorney-client privilege, and the resource needs of public defenders. All of these are weighty matters, yet none are violations of established Sixth Amendment rights. Congress in the first instance is the proper body to deal with these issues, and courts in specific cases are always present to prevent or to punish abuses.

In the Comprehensive Forfeiture Act of 1984, Congress recognized that the illegal drug trade poses a grave threat to every part of our society. The trade has spawned violent crime, threatened the integrity of local law enforcement, and condemned countless thousands of young lives to the service of a chemical compulsion. "Profit is the motivation for this criminal activity, and it is through economic power that it is sustained and grows." S.Rep. No. 225, 98th Cong., 1st Sess. 191, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3374. The Comprehensive Forfeiture Act represents, above all, Congress' attempt to "strip these offenders and organizations of their economic power," and the recognition that "forfeiture is the mecha-

nism through which such an attack can be made." Id.

 The unwarranted creation of an outright constitutional ban on fee forfeiture will not only restrict the scope of Congress' past efforts to address this problem; it will eliminate future legislative flexibility to deal with fee forfeiture in different ways. This would be an unwarranted judicial intervention into the legislative arena. The fact that judicial balancing of societal and individual interests is regularly and properly employed in areas of constitutional rights and liberties does not lessen the fact that balancing of personal and public interests is presumptively a matter of legislative prerogative. Absent a constitutional right, which we have not found to be present here, the balancing of public and private interests is for Congress under its enumerated powers and for state legislatures under their residual police powers.

Indeed, we recognize that upon weighing the interests involved here, Congress could well decide that exemption of attorneys' fees from forfeiture is the wisest course. Many substantial arguments can be made for such a result. Congress may decide that public defenders would be overburdened by additions to their caseloads that fee forfeiture may cause, or that the present public compensation scheme for appointed attorneys under the Criminal Justice Act, 18 U.S.C. § 3006A, is inadequate to finance CCE defenses. It may be too that Congress will perceive specialized private law firms as uniquely capable of undertaking lengthy and complex CCE defenses. Investigation may show that the threat of fee forfeiture has caused withdrawal of counsel and disruption of trials. Congress might find that the potential for conflicts of interest and chilling of attorney-client communications are entitled to substantial weight. Each of these concerns, however, requires exactly the type of inquiry that Congress through empirical investigation and public hearings is empowered to conduct. Choices concerning the relative roles of public defenders, appointed counsel, and the private bar in CCE

defenses are classic legislative matters. Every policy debate is not a constitutional debate, and the fact that lawyers are involved does not definitively mark a controversy as one of exclusive judicial competence.

Congress may also conclude that important public interests support fee forfeiture. First, the government claims a strong interest in deterrence that is served by fee forfeiture. It is true that no one engages in crime solely to make money to hire attorneys. Yet the drug kingpin's certain knowledge that he may have at his beck and call lawyers whose fees run into hundreds of thousands of dollars may make him less apprehensive about continuing in his business. Congress has already underscored the compelling public interest in stripping criminals such as Reckmeyer of their undeserved economic power, and part of that undeserved power may be the ability to command high-priced legal talent.

Also at stake in the forfeiture debate are the effects on the bar and on the public's perception of the administration of justice. Of course, we are not concerned here with sham transfers to attorneys—these are obviously forfeitable. Even with regard to actual fees, however, there may be problems with a rule that allows attorneys to knowingly profit from money made in the drug trade. *See* Merkle, *Are Prosecutors Invading the Attorney-Client Relationship?*, 71 A.B.A.J. 38, 19 (1985). Insulation of legal fees from forfeiture could also make it far easier for attorneys to become involved in organized crime as ongoing legal advisers, rendering legal advice to help drug violators thwart investigations and avoid indictments.

The effect of such a trend on the legal profession may be anything but salutary. Public confidence in the administration of justice might be a casualty of exempting attorneys' fees from forfeiture. Public cynicism and distrust of the legal system might grow as citizens watched huge sums of cash being seized in drug raids and then flowing straight into the pockets of lawyers under a claim of constitutional special privilege. We cannot foresee what different approaches Congress may take toward the problem of fee forfeiture. The interests on each side of this controversy are weighty and profound. We believe, however, that this is not a debate that should be silenced by judicial fiat.

## VIII.

The modern day Jean Valjean must be satisfied with appointed counsel. Yet the drug merchant claims that his possession of huge sums of money, which there is probable cause to believe is illicit, entitles him to something more. We reject this contention, and any notion of a constitutional right to use the proceeds of crime to finance an expensive defense.

The order of forfeiture in this case is subject only to the rights of third parties as they are specifically defined by Congress in 21 U.S.C. § 853(n). The judgment of the district court, exempting appellee's fees from the order of forfeiture, is hereby

REVERSED.

WIDENER, Circuit Judge, concurring:

I concur in Judge Wilkinson's majority opinion without reservation.

I would add, however, that I think we lend too much dignity to this claim.

Reckmeyer admittedly was represented by capable, paid attorneys throughout all stages of his criminal prosecution. Whatever he has suffered has not been for lack of counsel of his choice. Reckmeyer, therefore, has not suffered any loss of any Sixth Amendment right to counsel.

Any substantive rights Caplin & Drysdale may have to the money which was seized by the government prior to Reckmeyer's unlawful payment to Caplin & Drysdale, in violation of the attachment order, can rise no higher than Reckmeyer's right. Since Reckmeyer had no Sixth Amendment right at the time of the payment to Caplin & Drysdale, then Caplin & Drysdale should have no Sixth Amendment right to assert in this proceeding.

Left to my own devices, I would not reach any constitutional question which may be involved and would simply reverse.

I am outvoted, however, by my colleagues on my theory of the case, and therefore I join Judge Wilkinson's opinion.

MURNAGHAN, Circuit Judge, concurring:

Judge Wilkinson has said nearly all there is to be said and, in concurring, I do not wish to be viewed as departing from him in any substantial way. On the contrary, I merely wish to add one or two thoughts which may have a bearing on the subject which is one of wide interest and considerable importance.

The first is not a problem directly involved in the current case. However, it is a matter of continuing importance which, should it arise, would considerably limit or alter the opinion expressed in Judge Wilkinson's effort. The opinion assumes that Criminal Justice Act appointments of counsel for indigent defendants sufficiently satisfy the constitutional guarantee of adequate representation of counsel. However, there has always been a tension to this assumption because the rate scale for appointees under the Criminal Justice Act tends to linger, sometimes substantially, behind the "going rate". If the gap between what the government will provide to an indigent defendant so that he or she can make a respectable defense and the market rate for a respectable defense reaches a significant point, much of the rationale of Judge Wilkinson's opinion will have been undercut. Research of the question of adequacy of compensation to court appointed counsel involves many diverse and complicated questions. On the one hand, it will be distasteful for the government to set a fee scale interfering with the private right of defense lawyers to set their fees at whatever level they deem appropriate. Normally in a free market participants are free, even encouraged, unilaterally to set prices. Also, lawyers may be expected to resist to the end any approach which involves assignment to represent a defendant when the lawyer would prefer not to assume the defense. On the other hand, letting anyone, lawyer or other person, unilaterally to fix the price in an area infused with a great public interest has obvious disadvantages. These multi-fold questions are manifestly ones for the legislature initially. However, paying lawyers inadequately has drawbacks, especially when other contractors, say for the construction of government buildings, would be astonished and indignant if asked to perform the work on a non-compensatory basis. Should the adequacy of counsel's compensation reach a level of constitutional inquiry, the underpinnings support for Judge Wilkinson's opinion, excellent as it is as things now stand, may require reexamination.

On a second subject, there is the consideration implicitly present in all situations such as the one faced by Caplin and Drysdale Chartered here, that the defendant may be innocent or at least has not been proven guilty at the time the lawyer is approached with a view to retaining him or her (or them) to undertake a defense. The lawyer's creed, formerly common, that the practice of the law is not, or at least not primarily, merely a money grubbing business tends to suffer somewhat when counsel, faced with the necessity of appearing on a contingency basis, screams "constitutional" violation. After all, if the case develops in a way favorable to the defendant, the forfeiture or the attempt at forfeiture may be voided, and the funds that had been noticed for forfeiture would, therefore, be available to meet legal fees.[1]

The fact that perhaps the contingency is too risky financially to be attractive should not alert constitutional considerations. Indeed, when the shoe is on the other foot, some lawyers engaged in personal injury practice will not willingly represent a po-

---

1. It should be emphasized that in alluding to the contingent fee I am in no way attempting to diverge from the Model Code of Professional Responsibility or the Model Rules of Professional Conduct. I am aware that both the Model Code and Model Rules prohibit a contingent fee in a criminal case. Model Code of Professional Responsibility DR 2–106(C) (1980); Model Rules of Professional Conduct Rule 1.5(d)(2) (1983). I write at the constitutional level; I did not feel a contingent fee would be unconstitutional. I in no way mean to imply that on another level ethical principles might not evolve which would outlaw contingency in fees.

tential client even though he or she is quite sufficiently endowed with adequate funds to meet the lawyer's charges on an hourly fee basis and would prefer to do so. Instead, some such lawyers have been known to insist only on doing such work on a contingent fee basis, presumably because, overall, the likelihood of success is great and, when all the cases are jumbled together, the contingency fee at perhaps 30% or more of recovery is more attractive to the lawyers than a fixed hourly fee from a fully solvent plaintiff. Indeed, the American Bar Association's Standing Committee on Ethics and Professional Responsibility in its informal opinion 1521 (1986) went so far as to state that it was unethical for a lawyer not to offer prospective clients alternative fee arrangements before accepting a case on a contingent-fee basis. One rationale was that the fiduciary nature of the relationship requires the lawyer to discuss with the prospective client who can pay a fixed fee the alternative of doing so before accepting a contingent-fee arrangement. *See* Model Code of Professional Responsibility DR 2–106 (1980); Model Rules of Professional Conduct Rule 1.5 (1983).

In short, lawyers hardly had a *constitutional* basis for saying they were entitled to insist on contingent fee bases before undertaking representation in accident cases. By a similar token, protection against a requirement, in effect, that they take representation on a contingency fee basis alone does not seem to rise to the constitutional level.

JAMES DICKSON PHILLIPS, Circuit Judge, dissenting:

I agree with the court's holding that the appellee-lawyers have standing in this case to challenge the statutory forfeiture provisions, and that, as written, those provisions reach property contracted for or paid as attorney fees just as any other property made subject to forfeiture by the provisions.

For reasons expressed in the superseded panel opinion, 814 F.2d 905, 918–27, however, I dissent from the court's further holding that the forfeiture provisions, as applied to such property, violate no constitutional right of the defendant. I would hold instead that to the extent those provisions permit the government to deprive the defendant in a criminal case of the ability to pay legitimate and reasonable attorney fees for his defense against the underlying criminal charges, they violate this specific sixth amendment right.[1] On that basis, I dissent from the court's judgment.

Having already expressed my views on the constitutional issue, there is no need to repeat them here in detail and I adopt the relevant portions of the vacated panel opinion as the basis of my dissent here. I have only a few additional thoughts prompted by the en banc court's constitutional analysis.

That analysis rightly focuses on the qualified right to counsel of choice as the particular aspect of the multifaceted sixth amendment right ultimately implicated by these forfeiture provisions. As I read the court's opinion, it holds that Congress does not violate this right by allowing government prosecutors to prevent RICO and CCE defendants (or imminent defendants) from using allegedly tainted financial resources with which, barring governmental action, they would be able to hire and retain private counsel to defend them against those charges. This is said to be so for several reasons which simply bespeak the severely qualified nature of this particular right.

First, there is the fact that by its very nature this constitutional right of an accused person—uniquely among those protected in the bill of rights—is dependent upon the possession of financial resources with which to exercise it. Seizing on this undoubted irony, the majority points out that a defendant does not have the resources to exercise the right, hence has no right, when the government has already,

1. As indicated in the panel opinion, 814 F.2d at 927, such a holding obviously would not prevent forfeiture of assets transferred to attorneys in fraudulent or sham transactions, nor would it prevent any forfeiture that leaves a defendant with sufficient untainted resources to pay reasonable attorney fees.

by the relation-back feature of these forfeiture provisions, asserted a paramount interest in the resources.

With all respect, this simply begs the constitutional question rather than answering it. Indeed, the ultimate constitutional issue might well be framed precisely as whether Congress may use this wholly fictive device of property law to cut off this fundamental right of the accused in a criminal case. If the right must yield here to countervailing governmental interests, the relation-back device undoubtedly could be used to implement the governmental interests, but surely it cannot serve as a substitute for them.

Under developed principles defining the qualified right to counsel of choice, the dispositive issue is whether there *are* countervailing governmental interests that do justify the drastic expedient of freezing and ultimately forfeiting the assets of RICO and CCE defendants to the point that they cannot retain private counsel for their defense. The majority, accepting the government's arguments, first finds comfort for such defendants in the fact that other guarantees in the sixth amendment insure that even if the government effectively reduces them to indigency, they will be entitled to appointed public counsel who will then be held to minimal standards of effective assistance. By this, the majority necessarily announces the general principle that the constitutional right to private counsel of choice actually hangs on the thread of unconstrained legislative indulgence; that the only effective constraint on the legislative branch is that it may not deny defendants the back-up right to the minimally effective assistance of appointed public counsel.[2]

With the right to counsel of choice reduced to such modest dimensions, it may be thought fairly easy to discern countervailing governmental interests that justify its obliteration for the particular classes of defendants targeted by this legislation. Of course it is to the special quality and enormity of these crimes—organized drug dealing and racketeering on the grand scale— that Congress understandably looked in justifying the wide-ranging across-the-board criminal forfeiture provisions. And it is to the same factors that the majority now looks to find justification for the special impact of these provisions upon RICO and CCE defendants' ability to retain counsel for their defense, a special impact which, interestingly—as we all agree—Congress itself did not consider, at least so far as the statutes and legislative history reveal.

Of course these particular crimes are enormous in their dreadful consequences for our society, and their perpetrators utterly despicable. I am prepared to accept that the depredations of organized crime, particularly those involving drug dealing in contemporary society, rank just behind human slavery among the sorest domestic afflictions of our history. But I do not believe that the enormity of particular crimes and types of criminal activity and the despicability and power of particular types of criminals can properly be weighed in this particular constitutional balance. In my view, the right to private counsel of choice guaranteed by the sixth amendment cannot be made to turn on how bad the particular crime or criminal may be, but that, I think, is the linchpin of the majority's constitutional analysis.[3]

For these reasons, I remain persuaded that the sixth amendment prevents govern-

---

**2.** This case of course only deals with the sixth amendment rights of RICO and CCE defendants. But the majority's analysis of the tenuous nature of the right to private counsel of choice as against the government's powers of forfeiture obviously sweeps wider.

**3.** Judge Murnaghan apparently finds additional comfort in the fact that the forfeiture provisions simply put criminal defendants and their lawyers in the same position as that of civil plaintiffs and their lawyers operating under contin-

gent fee contracts. The constitutional irrelevance of that analogy is so obvious that, with all respect, one wonders if the real thought is not that there are also bad lawyers to be taken into account in assessing the governmental interests at stake. Of course Congress advanced no such justification, and there is nothing in this record to support such a view. In any event, the constitutional infirmity I would find would reward no such lawyers.

mental freeze orders and forfeitures whose effect is to deprive criminal defendants of their ability, otherwise present, to employ private counsel for their defense against the underlying charges on which the freeze order or forfeiture is based.

HARRISON L. WINTER, C.J., and SPROUSE and ERVIN, JJ., have asked to be shown as joining in this dissenting opinion.